DaRoyce Lamont MOSLEY, Appellant,

v.

The STATE of Texas.

No. 72281

Court of Criminal Appeals of Texas,
En Banc.

July 1, 1998.

Cynthia Hujar Orr, San Antonio, for appellant.

* Editor's Note: The opinion was ordered to be published in part.

1. § 19.03(a)(2) provides that a person commits capital murder when he commits murder under § 19.02(b)(1) and "the person intentionally commits the murder in the course of committing or attempting to commit ... robbery" (ellipsis inserted).

C. Patrice Savage, Asst. District Attorney, Longview, Matthew Paul, State's Atty., Austin, for State.

### OPINION ON COURT'S MOTION FOR REHEARING*

KELLER, Judge, delivered the opinion of the Court, in which McCORMICK, P.J., and MANSFIELD, HOLLAND and WOMACK, JJ. Joined.

Our prior opinions are withdrawn.

Appellant was convicted in October 1995 of capital murder. Tex. Penal Code § 19.03(a)(2).[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises points of error numbered through 176.[3] We will affirm.

### A. SUFFICIENCY OF THE EVIDENCE

#### 1. Guilt

■ In point of error 126, appellant contends that the evidence is legally insufficient to establish his guilt per the indictment: intentionally causing the death of Patricia Colter while in the course of committing and attempting to commit the robbery of Sandra Cash. Specifically, appellant asserts that the State failed to prove his intent to cause the death of Patricia Colter.

Viewed in the light most favorable to the verdict, the evidence at trial established the following: At approximately 11:45 p.m. on July 21, 1994, Sandra Cash, the night waitress at Katie's Lounge in Kilgore, was closing up for the evening and placing the night's receipts, including about $308 in cash, into a tackle box Katie's used for money. Four customers remained and were keeping her

2. Unless otherwise indicated all future references to Articles refer to Code of Criminal Procedure.

3. There are no points of error numbered 75–77. We adopt appellant's numbering for ease of reference.

company. Cash looked out the window and saw two men walking up and joked that she would have to make the men mad because she had already "closed everything up." Suddenly, the door was kicked open and two men in ski masks came in and stated they were there to rob them. Both men were brandishing guns. The man that burst through the door first said, "Give me the money, you white bitch." Cash slid the tackle box towards this first man, but he shot her anyway. As Cash shielded her face with her hands, the shot hit her in the wrist and went through her hand. She was then shot in the stomach and she fell to the floor. Cash remembered hearing more gunfire, but could remember little else after she was shot. However, in this shock-induced state, Cash still managed to call 911.

When the police and emergency medical services (EMS) arrived shortly thereafter, they discovered the bodies of the four customers: Patricia and Duane Colter, Luva Congleton, and Alvin Waller. Cash, the only survivor, was removed by EMS and taken to the hospital. Cash had nine holes in her body from approximately three to four bullets, two of which were recovered from her at the hospital; the police recovered a third bullet from behind the bar where Cash was shot. Cash had wounds to her wrist, heel, right breast, and abdominal cavity. However, the most serious wound went across her upper body, perforating both lungs and going through her spinal cord thereby leaving her permanently paralyzed from the chest down. All three recovered bullets were fired from the same gun.

At the autopsies, the medical examiner determined Patricia and Duane Colter each died from a single gunshot wound to the back of the head. Both bullets were recovered from the victims. Congleton also died from a gunshot wound to the back of the head, but the bullet exited and was not recovered at the autopsy. Waller received three gunshot wounds—two to the head and one to his thigh. Any one of the three wounds would have been fatal.

Appellant, Marcus Smith, and Ray Don Mosley (appellant's uncle) were separately arrested the next evening after the police received information from various sources. Ricky Wheat gave the police one of their first leads. Ricky lived across the street from Katie's Lounge and testified that on the evening of July 21, 1994, he and his brothers, Darrell and Napoleon, and some other guys were sitting in the front yard drinking beer. Ray Don, his friend, walked up and stated there was some money in the area and he had to have it. Ray Don was accompanied by Marcus and a man later identified as appellant. Ricky noted Ray Don had a pistol on him at the time. The three men stayed about five minutes and then walked off. Ricky eventually went inside. About thirty minutes later, Ray Don returned and stated he had shot someone over at Katie's and needed a ride. Ricky refused, but Napoleon agreed. Marcus and appellant then came walking up from the direction of an abandoned building. Napoleon and Darrell then gave Ray Don, Marcus, and appellant a ride. Ricky testified the men had a tackle box that he had not noticed the first time the men had come by.

After first stating appellant was not involved with the crime, Christopher "Kaboo" Smith, appellant's best friend and Marcus's cousin, also gave information to the police. On the evening of July 21, 1994, appellant told Kaboo he planned to "make a gank move" at Katie's that night.[4] Later that evening, Kaboo saw appellant with a gun. Appellant stated he got the gun from Kaboo's neighbor, Stanley Rossum, and was going to use it to rob Katie's. Kaboo recognized the gun as belonging to Rossum. Appellant left, but when he returned later he stated, "We did it." Ray Don and Marcus came into Kaboo's room shortly thereafter.

Appellant told Kaboo some of what happened during the robbery at Katie's. Appellant stated that Ray Don had shot the lady behind the counter and had told appellant to get the people from underneath the pool table. Appellant said he complied, told the people they were moving too slow, and shot them. Appellant never stated he had been forced into doing the robbery in any way.

4. Kaboo testified that a "gank move" means to rob or steal.

Appellant then brought in a box and began counting the money inside. Appellant divided the money evenly between himself, Kaboo, Ray Don, and Marcus, each receiving seventy-seven dollars. Although Kaboo had not helped with the robbery, he testified he took a share of the money "just because [he] wanted it."[5] Appellant and Kaboo then discussed appellant's plans to buy a new car the next day with the proceeds of an insurance check he had received.

After appellant purchased his car the next day, he went to see Kaboo. They went to the mall where appellant spent his seventy-seven dollars on shoes, cologne, a shirt, and shorts. Afterwards they went to Taco Bell. Appellant told Kaboo he had taken his grandfather with him to buy the car. When appellant and his grandfather went out to eat afterwards, appellant told his grandfather he was involved in the crime, but after seeing the shocked look on his grandfather's face, appellant told him he was just playing. Also, upon returning from the mall, appellant had picked up his brother, Franceosa, and Marcus. The police pulled them over and arrested Marcus. The police were unaware of appellant's involvement at this time. However, the police asked all the occupants of the car if they might voluntarily come to the police station to answer some questions. Everyone agreed. While driving them to the police station, Kaboo stated appellant seemed nervous and scared "like it was on his conscience." The occupants of the car agreed they would not say anything to the police. Kaboo changed his mind the next day.

Once at the police station, appellant stated he had no involvement in the robbery and murders. However, later that evening appellant was arrested due to information received from Marcus. When informed he was under arrest, appellant cried out, "Oh what have I done. I've ruined my life. I'm going to spend the rest of my life in jail." Appellant stated he shot two of the people in Katie's. He then agreed to answer more questions about the crime, but requested that his grandparents be there when he did so. The police arranged to have his grandparents come in.

Once his grandparents arrived, appellant gave an oral confession, which was made into a written statement. In this confession, appellant stated the offense had been planned a couple of days before. He further stated that once it was time to commit the crime, he did not want to participate; and, although he was present during the offense, he did not shoot anyone. He did admit to borrowing a gun from Stanley Rossum, but claimed Marcus took it from him once they were inside Katie's. Appellant also told them he had been wearing a toboggan during the offense and had thrown it into the woods near Nate Wheat's house.

The next morning, Special Agent Larry Smith of the Bureau of Alcohol, Tobacco, and Firearms[6] asked appellant if he would be willing to show him and the police where he had thrown the toboggan. Appellant agreed and directed Smith to an area next to an abandoned building near Katie's where the toboggan and a glove were recovered. Appellant admitted he had been wearing the glove during the robbery. Smith advised him there were scientific tests that could be run on the glove to determine if it had been worn when firing a gun. He then asked if appellant had anything to add to the statements he had already given. At this point, appellant stated he shot four people at Katie's and Ray Don shot the girl behind the bar. He further admitted he had used a .380 automatic pistol he borrowed from someone named Stanley. Appellant agreed to make another written statement later that day after getting some rest.

Appellant gave his final confession later that day. Appellant stated that the idea of committing the crime came up because he told Ray Don and Marcus that he felt like "doing something devious." Appellant said he had never done anything bad before and he felt like doing something bad. Ray Don

---

5. Kaboo eventually returned his share of the money to the police.

6. Along with the Kilgore Police Department, Texas Rangers, and County Sheriff's Office, the Federal Bureau of Investigation and Bureau of Alcohol, Tobacco, and Firearms also assisted in the investigation.

suggested robbing Katie's. He further stated that although he told them on July 21, 1994, that he did not feel like doing it anymore, he went along with it anyway and borrowed a gun from Stanley. Ray Don had also obtained a gun. Appellant then described the crime:

Ray Don went in first and told everybody to get down. They were still sitting up in the chairs and I heard a shot. The people looked at me and it scared me and I shot a lady at the table. I was about five feet from her and I shot her in the back of the head. Another lady got up and ran. Ray Don told me to kill them. Ray Don told me to shoot them or get shot. When I looked at Ray Don, he was pointing the gun at me. He said this after I had already shot the first lady. Then I shot a man that was sitting by the first lady I shot. I don't know where I shot the man at. I was about the same distance I was when I shot the lady. By this time the lady that ran had gotten under the pool table. I told the lady to get out from under the pool table. Ray Don said, "Fuck that, shoot her." Then I shot the lady under the pool table twice in the head. I bent down next to the pool table and shot her twice. Then Ray Don was behind the bar and had shot behind there. I came from around the pool table and another man was by the bar. The man got up and was coming towards me with a pool stick. Ray Don said, "Shoot him boy, shoot him." I just turned my head away and shot three times. The man fell after I had shot three times. Ray Don had gotten the money in a big box from behind the bar. The box was dark colored. Then we ran out and ran across the street. Ray Don started hollering and asking me where Marcus was at. I kept telling him I didn't know. Then we saw Marcus come up behind us after we crossed Highway 135. Ray Don asked Marcus where he had been and Marcus told him he had been trying to break in a car. Marcus went into Katie's when Ray Don and I went in. After I shot the first

lady, I looked around and Marcus had left Katie's.

Police recovered the .380 automatic pistol which had been returned to Stanley Rossum. Ballistic tests showed this was the same gun used to fire the bullets recovered from the bodies of Patricia Colter, Duane Colter, and Alvin Waller.[7] The bullets recovered from Sandra Cash were fired from a different weapon.[8] Tom Bevel, blood-stain pattern expert and crime reconstructor, also testified that due to the location of impact spatter and other evidence, it was his opinion that there were two weapons used by two different shooters, one shooting the four deceased victims and one shooting the surviving victim. He further stated that both Patricia and Duane Colter were shot in an execution-style manner.

 In reviewing a sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mason v. State*, 905 S.W.2d 570, 574 (Tex.Crim.App.1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 670 (1996). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim.App.), *cert. denied*, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim.App.1986).

Viewed in the light most favorable to the verdict, the evidence shows appellant planned the robbery and brought with him a deadly weapon, a .380 automatic pistol,[9] in order to accomplish the task. The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weap-

---

**7.** As stated previously, no bullets were recovered from the body of Luva Congleton.

**8.** This second weapon was never recovered.

**9.** A firearm is defined as a deadly weapon. Texas Penal Code § 1.07(a)(17)(A).

on. *Ross v. State,* 861 S.W.2d 870, 873 (Tex. Crim.App.1992); *Godsey v. State,* 719 S.W.2d 578, 581–82 (Tex.Crim.App.1986). Further, the evidence shows that Patricia Colter was shot in the back of the head from a distance of probably less than five feet. Applying the *Jackson* criteria to the facts of this case, we find a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally caused the death of the Patricia Colter. Point of error 126 is overruled.

## B. GRAND JURY CHALLENGE

■ In point of error 60, appellant contends that Gregg County's method of selecting the foremen of its grand juries violates the Equal Protection Clause of the Fourteenth Amendment. He argues that the statistical evidence shows a significant disparity between the proportion of black persons serving as grand jury foreman and the proportion of black persons who reside in Gregg County. He argues, based upon *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), that this disparity established a prima facie case of discrimination, and he further argues that this prima facie case was not rebutted by the State.

He concedes that we have held adversely to his position in *Rousseau v. State,* 855 S.W.2d 666, 687–688 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993) due to the ministerial nature of the duties possessed by the foreman, but he argues that *Rousseau* was wrongly decided. In support of this position, he points to *Rousseau*'s failure to cite authority for its holding and to federal circuit cases. Contrary to our pronouncement in *Rousseau,* the Fifth and Third Circuits have both held that a defendant may advance a viable equal protection claim based upon the discriminatory selection of a grand jury foreman even where the foreman has only ministerial duties. *Johnson v. Puckett,* 929 F.2d 1067 (5th Cir.), *cert. denied,* 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991); *Ramseur v. Beyer,* 983 F.2d 1215 (3rd Cir.1992). *See also James v. Whitley,* 39 F.3d 607 (5th Cir.1994).

The United States Supreme Court has never addressed the particular fact pattern before us. The two leading Supreme Court cases in this area of the law are *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) and *Hobby v. United States,* 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). In *Rose,* the Court assumed "without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." 443 U.S. at 551–552, n. 4, 99 S.Ct. 2993. In *Hobby,* however, the Court refused to make such an assumption concerning the selection of a federal grand jury foreman. 468 U.S. at 349, 104 S.Ct. 3093. The Court found several relevant factors distinguishing the two cases: (1) the claim in *Rose* was brought by members of the class (black persons) allegedly excluded from service as foreman while *Hobby* involved a white male who was not a member of the allegedly excluded classes (black persons and women), (2) *Rose* involved an equal protection claim while *Hobby* involved only a due process fundamental fairness claim, (3) the foreman in *Rose* was selected independently from a list of potential grand jurors in addition to the other members of the grand jury while the foreman in *Hobby* was selected from grand jurors that had already been chosen, and (4) the foreman in *Rose* possessed substantive decision-making powers in addition to those possessed by ordinary grand jury members while the foreman in *Hobby* possessed only ministerial duties. *Hobby,* 468 U.S. at 347–349, 104 S.Ct. 3093. Recently, the Supreme Court has extended *Powers*'s [10] concept of third-party standing in the *Batson* [11] context to the Grand Jury setting. *Campbell v. Louisiana,* 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998).[12] Hence,

10. *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

11. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

12. We note that, under Louisiana law, the foreperson is selected separately from the grand jury. *Campbell,* 118 S.Ct. at 1422. Hence, *Campbell* was similar to *Rose* under factor (3).

we will assume that factor (1) is no longer a relevant distinction between the situations found in *Rose* and *Hobby*.

The present case falls in between *Rose* and *Hobby*. Like *Rose*, this case involves an equal protection claim. And, as in *Hobby*, the foreman in this case was selected from grand jurors that had already been chosen, and the foreman possessed only ministerial duties in addition to his normal duties as a grand juror. Although we recognize the existence of adverse authority from some federal circuits, we nevertheless conclude that the present fact situation should be governed by *Hobby*.[13] Appellant's own equal protection interests are satisfied by the impartial selection of the members of the grand jury. That selection ensures that the decision-making process is not tainted by racial discrimination. Because the foreman's additional duties are merely ministerial, they do not impact on appellant's right to a grand jury determination of probable cause to go forward with a prosecution. *See Campbell,* —— U.S. at ——, 118 S.Ct. at 1425. Nor do we think that appellant has any significant interest in ensuring the nondiscriminatory selection of persons who perform ministerial duties. One would not contend, for example, that a defendant's conviction should be reversed because of the discriminatory selection of a clerk who file-stamps court documents, a bailiff present in the courtroom during trial, or a court coordinator who arranges hearings and trials on the docket.

Of course, it is true that discriminatory selection impedes the rights of grand jurors who might potentially serve as foreman. But, the above list of examples of positions with ministerial duties indicates that the criminal defendant's case is not necessarily a good forum to address such discrimination. Hence, we reaffirm our holding in *Rousseau*. Point of error 60 is overruled.

## C. GUILT/INNOCENCE

### 7. Judicial disqualification

In points of error 105 and 106, appellant contends that Judge Khoury was disqualified, under Texas Constitution, Article 5 § 11 and

under Article 30.01 of the Texas Code of Criminal Procedure, from presiding over the trial because one of the complaining witnesses, Officer Falco, was within the third degree of consanguinity (the judge's nephew).

Article 5 § 11 disqualifies a judge when he is related within the third degree to a "party." In a criminal case, the only parties are the State and the defendant. It is not possible to have ties of blood or marriage to "the State." Therefore Judge Khoury's relation to Officer Falco did not render the judge related to a party. Judge Khoury was not disqualified under the constitutional provision.

Article 30.01 disqualifies a judge when he is related within the third degree to the accused or the "party injured." Article 30.01's "party injured" language appears to be intended to include the victim (complainant), and we so hold. Officer Falco is not the victim in the present case. Judge Khoury was not disqualified by virtue of Article 30.01. Points of error 105 and 106 are overruled.

### 8. Motion to Suppress

In points of error 38 and 39, appellant contends that his own statements were erroneously admitted by the trial court in violation of Articles 2.122 and 38.22. Appellant makes no argument in support of his Article 38.22 contention; hence, we reject that contention as inadequately briefed. Former Tex.R.App. P. 74(f)(for current rule, *see* Rule 38.1(h)). He argues that Article 2.122 expressly limits the powers of federal agents in a state felony case to arrest, search, and seizure. We interpret a statute in accordance with the plain meaning of its words unless the words are ambiguous or the plain meaning leads to absurd results. *Boykin v. State,* 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). Article 2.122 provides in relevant part:

(a) The following named criminal investigators of the United States shall not be deemed peace officers, but shall have the

---

**13.** Federal circuit cases may be persuasive, but are not binding authority.

powers of arrest, search and seizure as to felony offenses only under the laws of the State of Texas:

(1) Special Agents of the Federal Bureau of Investigation;

. . .

(4) Special Agents of Alcohol, Tobacco and Firearms

Appellant interprets this statute as restricting the authority of federal peace officers to the specific acts of arrests, searches, and seizures. He claims that, because interrogation is not listed as one of the authorized acts, federal peace officers cannot conduct interrogations in state criminal investigations.

Appellant's argument misreads the statute and misunderstands the nature of interrogation. Statutory authorization is required to *detain* a suspect, and such detention will likely make interrogation much easier. But, "interrogation" is not a legal act that requires statutory authorization. Anyone, including private citizens, can question a criminal suspect, and, absent statutory prescriptions to the contrary, a suspect is not legally required to answer any questions, whether from private citizens or law enforcement personnel. Article 2.13, listing the duties and powers of *state* peace officers, refers to the power and duty of an officer to arrest but does not refer to questioning as a power possessed by a peace officer.

While statutes exist that place limits upon a police officer's ability to conduct an interrogation (such as Article 38.22), Article 2.122 is not one of them. No reference to interrogation is made in Article 2.122. While the statute contains the word "only" after the phrase "shall have the powers of arrest, search and seizure as to felony offenses," the word "only" clearly modifies "felony offenses," indicating that federal officers do not have the powers of arrest, search, and seizure for misdemeanors. Hence, federal officers may conduct interrogations in state investigations. Points of error 38 and 39 are overruled.

**14.** Appellant alleges both statutory and constitutional violations. We will assume the error is constitutional and apply the "beyond a reason-

### 9. Evidence issues

In points of error 22 through 29, appellant contends that the trial court improperly excluded Kevon Johnson's testimony concerning a statement allegedly made by Ray Don Mosley that Ray Don had killed all of the victims. Appellant contends that exclusion of this testimony violates various statutory and constitutional provisions. However, assuming without deciding that exclusion of Johnson's testimony was error, we find the error to be harmless.[14]

On offer of proof outside the jury's presence, Johnson testified as follows:

Q. And who did he [Ray Don] indicate did the shooting in Katie's Lounge?

A. Himself.

Q. Okay. Did he indicate that DaRoyce Mosley did any shooting in Katie's Lounge?

A. No, sir, he didn't, sir. He just said DaRoyce was just there.

. . .

Q. And so Ray Don said he is the one who killed all the persons in Katie's Lounge.

A. He didn't say that he killed all the people. He just said he did the shooting and DaRoyce was just there.

(Bracketed material and ellipsis inserted).

Similar testimony was offered before the jury by Kevin Williams:

A. He [Ray Don] was talking about how he went in there and he started shooting. And then he was saying how he did it and all this stuff.

. . .

Q. Okay. What did he say about DaRoyce? What did he say DaRoyce did?

A. He said he was scared to go in. He said he was scared to go in and stuff like that.

Q. Okay.

A. He had to make him go or something like that.

able doubt" standard found in Tex.R.App. P. 44.2(a).

Q. Okay. Did he say that he's the one that did the shooting—that Ray Don was?

...

A. He said he's the one that did the shooting.

(Bracketed material and ellipses inserted). Moreover, appellant offered the testimony of four other witnesses who reported statements by Ray Don that he killed all the victims in Katie's Lounge.

In light of other testimony about Ray Don's admitting to killing all of the victims, the likely impact of an additional witness on that matter is small. We have held in the erroneous admission of evidence context that the admission of other similar evidence can render error harmless. *Livingston v. State,* 739 S.W.2d 311, 334 (Tex.Crim.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Although the rule may not always apply in the same fashion to the erroneous exclusion of evidence, we find that the admission of evidence similar to what the appellant wished to offer may, under some circumstances, mitigate against the harm he would have otherwise suffered. Here, Johnson's testimony does not appear to be different or more powerful than that of other witnesses that actually testified. We find in the present case that the similar testimony from other witnesses mitigates against the harmfulness of any error. Further, the evidence that appellant killed the four victims is very strong. Appellant admitted in his confession to the police to killing the four victims. He also admitted to using a .380 pistol that was linked to three of the victims killed. He made similar statements to his friend Kaboo concerning his participation in the murder and his use of the gun. It has been noted that a confession can be especially strong evidence of guilt. *Garcia v. State,* 919 S.W.2d 370, 397 (Tex.Crim.App.1994)(plurality opinion). The State had not only appellant's confession to law enforcement personnel, but it also had his admission of guilt to a friend. Given the strength of the State's case and the presence of other testimony concerning Ray Don's admissions of guilt as the sole perpetrator, we find beyond a reasonable doubt that the exclusion of Johnson's testimony did not contribute to appellant's conviction or punishment. Points of error 22 through 29 are overruled.

### 11. Jury arguments

■ In point of error 78, appellant contends that the State improperly struck at appellant over the shoulders of counsel. The following occurred during State's argument:

[PROSECUTOR]: There is only one route to the truth. It is by traveling on the main road. That will take you to your proper destination. But you must stay on the main road. The defense has attempted to get you off the main road, to divert you. They don't want you to stay on the main road because they know where that will take you.

[DEFENSE COUNSEL]: Your Honor, I'll object to this improper comment on counsel and object to counsel testifying.

COURT: Overruled.

[PROSECUTOR]: They want you to take a side road, a series of side roads, rabbit trails, and a rabbit trail that will lead you to a dead-end. The truth is not there.

Appellant contends that the prosecutor's argument constituted an improper attack on defense counsels' honesty.

■ "This Court maintains a special concern for final arguments that result in uninvited and unsubstantiated accusation of improper conduct directed at a defendant's attorney." *Orona v. State,* 791 S.W.2d 125, 128 (Tex.Crim.App.1990). Trial judges should assume responsibility for preventing this type of argument. *Wilson v. State,* 938 S.W.2d 57, 60 (Tex.Crim.App.1996). In its most egregious form, this kind of argument may involve accusations of manufactured evidence, *Orona,* 791 S.W.2d at 129, or an attempt to contrast the ethical obligations of prosecutors and defense attorneys, *Wilson,* 938 S.W.2d at 58—60. The comments in the present case are milder, merely indicating that the defense attorneys would attempt to use argument to divert the jury's attention or obscure the issues. We have indicated in the past that such mild comments may not be erroneous, so long as they can be interpreted as an attack on

arguments made by the defense counsel. *Gorman v. State*, 480 S.W.2d 188, 190 (Tex.Crim.App.1972)(Prosecutor said of defense counsel: "Don't let him smokescreen you, he has smoke-screened you enough"). However, that holding has been brought into question by more recent precedent indicating that legitimate arguments by defense counsel cannot serve as a basis for permitting prosecutorial comments that "cast aspersion on defense counsel's veracity." *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim.App.), *cert. denied*, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995)(Prosecutor stated that defense counsel "wants to mislead you a little bit by saying. . . .").

Although it is impossible to articulate a precise rule regarding these kinds of argument, it is fair to say that a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character. In the present case, the argument referred to counsel personally and, although not saying so explicitly, it suggested that counsel wanted to divert the jury from the truth. We will assume the argument was inappropriate.[15]

■ Assuming that the trial court should have sustained appellant's objection, we must determine whether the error warrants reversal. Error is not reversible if it is harmless. In the past, we determined the harmfulness of this type of error by conducting a harm analysis under former Tex.R.App. P. 81(b)(2) and asking whether there is a "reasonable possibility" that the improper argument might have contributed to conviction. *Wilson*, 938 S.W.2d at 61. However, with the advent of the new rules of appellate procedure, the proper harm analysis to be conducted depends upon the kind of error involved. For constitutional errors, the old Rule 81(b)(2) standard remains, now present in Tex.R.App. P. 44.2(a). But nonconstitutional errors are governed by a new standard, formulated in Rule 44.2(b). Although a special concern, improper comments on de-

fense counsel's honesty have never been held to amount to a constitutional violation. Instead we have characterized such comments as falling outside the areas of permissible argument. *Wilson*, 938 S.W.2d at 59. We find that such comments constitute "other errors" within the purview of Rule 44.2(b).

Rule 44.2(b) provides that: "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." The rule is taken directly from Federal Rule of Criminal Procedure 52(a) without substantive change. *See* Notes and Comments, Tex.R.App. P. 44. Hence, in construing the impact of Rule 44.2(b), federal caselaw would appear to provide especially useful guidance. In applying the federal rule to improper argument cases, federal courts generally look to three factors: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *United States v. Millar*, 79 F.3d 338, 343 (2nd Cir. 1996); *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir.1994).

Comments similar to those found in the present case have been addressed by several federal circuit court decisions. The Tenth Circuit addressed a defense claim that the prosecutor improperly commented on defense counsel by stating that the defendant's attorney "has attempted . . . to confuse the issue, throw sand in your eyes." *United States v. Wilshire Oil Co. of Texas*, 427 F.2d 969, 978 n. 15 (10th Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). While finding the remarks to be improper, the court held that "even if they were prejudicial their impact was promptly removed by the trial court's instruction to the jury." *Id.* In a First Circuit case, the prosecutor made various statements about the defense attorneys, such as, "they want like to scramble your heads, confuse you," "[t]hey wanted to confuse your head," and "[d]o not let the

---

15. More authorities supporting the inappropriateness of the comments are discussed below, in

connection with the harm analysis.

attorneys here intimidate you, ladies and gentlemen——." *United States v. Ortiz–Arrigoitia*, 996 F.2d 436, 440 (1st Cir.1993), *cert. denied*, 511 U.S. 1003, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994). The trial judge overruled objections to these comments. *Id.* The appellate court was "not persuaded that these comments were so prejudicial as to require reversal." *Id.* at 441. But, the court added, "We do not understand ... why, after numerous warnings from this court, the prosecuting attorneys ... persist in spiking their arguments with comments that put their cases at risk." *Id.* (ellipses inserted).

While the First and Tenth Circuits have found this type of argument to be clearly improper (though not reversible), the Second and Fifth Circuits have expressed less certainty about the impropriety of such criticisms of defense counsel. In *Millar*, the prosecutor argued that the defense of the case was

> "hog wash" and that the defense counsel had created a "smoke screen." The prosecutor also urged members of the jury to ask themselves whether defense counsel was trying to "confuse" them or "lead them astray."

79 F.3d at 343–344. The Second Circuit held: "The comments were mildly inappropriate, if that, and clearly do not rise to the level of severity sufficient to require reversal." *Id.* at 344. The court contrasted the case before it with an earlier case it had reversed when the prosecutor, during argument, differentiated the ethical roles of prosecutors and defense attorneys with regard to finding the truth. *Id.* (contrasting with *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir.1990)(prosecutor argued: "while some people ... go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees.")(ellipsis in original)). In *Palmer*, the prosecutor argued:

> Defense counsel wants you to focus on these little discrepancies: was [Palmer] ten feet away, was he fifteen feet away. Did he take two steps this way and then go north or did he run straight north. He wants you to focus on those little, tiny,

immaterial matters, because he wants to confuse you. He wants to throw up a smoke screen.

37 F.3d at 1086. The Fifth Circuit commented that "the context of the instant statements reveals that the prosecutor merely outlined his view of the defense strategy." *Id.* The court further explained that, given the testimony of certain witnesses, the prosecutor's comment did not amount to a mischaracterization. *Id.*

We turn now to the three-factor test discussed in *Millar* and *Palmer*. From the above discussion, we conclude that the comments in the present case were mildly inappropriate. Such comments do not directly accuse the defense attorneys of lying, and the comments do not suggest that any evidence was manufactured. *See also Dinkins*, 894 S.W.2d at 357 (similar comments not as egregious as an accusation that defense counsel manufactured evidence). At most, the comments indicate that the defense may be attempting to distort the jury's view of the evidence through clever argument. Such a comment does not inject new facts into the record, and the jury is in a position to evaluate the truthfulness of the prosecutor's assertion. Such a comment may even backfire if the jury disagrees with the prosecutor's assessment of defense counsels' actions. We do not condone the prosecutor's actions, but the severity of the misconduct is relatively small. The first factor of the harm test does not weigh very heavily in appellant's favor.

Turning to the second factor, we find that no curative action was taken. In fact, the prosecutor apparently reemphasized the statements after the trial court overruled appellant's objection. Nevertheless, we find that the third factor weighs heavily in favor of the State. The State had appellant's own confession and his admissions to a third party. The confession also led the State to a gun confirmed by ballistics tests to be the murder weapon for at least three of the victims of the incident including the victim named in the indictment. Given the mildness of the comments and the strength of the State's case, we find the error to be harmless. Point of error 78 is overruled.

## D. PUNISHMENT

In points of error 1 through 4, appellant contends that the trial court erred in admitting evidence concerning the good character of victims of the offense. He argues that victim character evidence is inadmissible under United States and Texas precedents. He also argues that the trial court additionally erred in admitting evidence of the character of victims other than Patricia Colter because the other victims were not named in the indictment and were therefore extraneous offense victims. The "extraneous offense" contention was not made to the trial court. Hence, that argument has not been preserved for review. Former Tex.R.App. P. 52(a)(now rule 33.1(a)(2)(A)).

As for his argument concerning victim character evidence, appellant contends that United States and Texas precedents treat "character" and "impact" evidence differently. "Impact" evidence is generally recognized as evidence concerning the effect the victim's death will have on others, particularly the victim's family members. "Character" evidence is generally recognized as evidence concerning good qualities possessed by the victim. Appellant contends that, while impact evidence is admissible, character evidence is not.[16]

However, the Supreme Court has never distinguished between the two types of evidence. That Court noted the importance of the trier of fact having evidence "of the specific harm caused by the defendant." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The Court noted that information about the victim can be an important humanizing factor essential for just decision-making in a death-penalty trial: "[T]urning the victim into a 'faceless stranger at the penalty phase of a capital trial'... deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a [capital] murder." *Id.* (citation omitted, ellipsis and bracketed material inserted). Hence, the Court concluded "that evidence *about the victim* and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. 2597 (emphasis added). While rejecting a per se rule excluding victim character and impact evidence, the Supreme Court did recognize the possibility that "unduly prejudicial evidence" could be introduced and held that the Due Process Clause would provide a mechanism for relief under those circumstances. *Id.* at 825, 111 S.Ct. 2597. The Court suggested that undue prejudice *might exist when the* evidence is designed to encourage "a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823, 111 S.Ct. 2597.

In *Ford v. State*, 919 S.W.2d 107 (Tex. Crim.App.1996), we held admissible testimony from survivors of the crime and from the decedent's father concerning the effect of the crime on their lives. *Id.* at 115–116. In *Smith v. State*, 919 S.W.2d 96 (Tex.Crim. App.1996), a majority of this court held that testimony concerning the victim's good character is inadmissible. *Id.* at 102 (plurality opinion); *Id.* at 104 (Overstreet, J. concurring). Three judges concurred in *Smith* without opinion. And in a concurring opinion, Judge Mansfield opined that victim character evidence should be admissible. *Id.* at 104–107. He noted a coworker's testimony concerning the victim's dedication to her students. *Id.* at 106. He also noted the victim's sister's testimony concerning the victim's love of animals, her degree in special education, and her membership in the national guard. *Id.* at 106–107. Judge Mansfield contended that such evidence was relevant to show "who Miss Birky was—that she was more than just a name" and that appellant had failed to show that the evidence was

---

16. We presuppose in our analysis that the defendant contesting the admission of victim impact and character evidence was unaware, at the time of the crime, of the victims' character or of the impact that the victims' deaths will have on others. Victim impact and character evidence of which a defendant is aware at the time he commits the crime is necessarily relevant to his future dangerousness and moral culpability.

unfairly prejudicial under Texas Rule Criminal of Evidence 403.

If *Smith* were the final word on the subject, appellant's argument that all victim character evidence is inadmissible would have some force. But more recently, we decided *Johnson v. State*, 1997 WL 209527, —— S.W.2d —— (Tex.Crim.App.1997). In *Johnson*, four members of this Court held that victim impact evidence was admissible but victim character evidence was not. *Id.* at *4, at —— (plurality opinion). But, in a concurring opinion joined by three other judges (Keller, Price, and Holland, JJ.), Presiding Judge McCormick opined that no distinction existed between impact and character evidence and that all such evidence was admissible as relevant to the statutory mitigation special issue. *Id.* at *16, at —— (McCormick, P.J. concurring). In a separate concurring opinion, Judge Mansfield contended that both victim character and victim impact evidence were admissible so long as only close family members (parents, grandparents, spouses, siblings) were permitted to testify. *Id.* at *18, at —— (Mansfield, J. concurring). Judge Mansfield contended that such evidence would be relevant and would not be subject to exclusion under Rule 403. *Id.* Earlier in his opinion, however, he opined that Rule 403 might play a role in limiting admission of victim impact and victim character evidence in general. *Id.* at *17, at ——.

■■■ Hence, a majority of this Court has approved the introduction of victim character evidence—four without qualification (as it relates to the mitigation special issue) and one if only close family members testify. Our jurisprudence in this area has been somewhat inconsistent and confusing at times. We take this opportunity to announce a consistent, if not always clear-cut rule to be followed in future cases: Both victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence.[17]

Rule 403 limits the admissibility of such evidence when the evidence predominantly encourages comparisons based upon the greater or lesser worth or morality of the victim. When the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society then the State exceeds the bounds of permissible testimony. We recognize that this standard does not draw a bright and easy line for determining when evidence concerning the victim is admissible and when it is not. Trial judges should exercise their sound discretion in permitting some evidence about the victim's character and the impact on others' lives while limiting the amount and scope of such testimony. Considerations in determining whether testimony should be excluded under Rule 403 should include the nature of the testimony, the relationship between the witness and the victim, the amount of testimony to be introduced, and the availability of other testimony relating to victim impact and character. And, mitigating evidence introduced by the defendant may also be considered in evaluating whether the State may subsequently offer victim-related testimony.

■■■ We find Judge Mansfield's concern in *Johnson* that limits be placed upon who may testify to be a valid one, but we do not believe that an absolute rule limiting testimony to family members within a certain degree of relationship is viable. More distantly related family members, close friends, or co-workers may, in a given case, provide legitimate testimony. That will depend on the closeness of the personal relationship involved, the nature of the testimony, and the availability of other witnesses to provide victim-related testimony. We do note that victim impact and character testimony from strangers, including those who learned about the case in the media and those who did so as participants in a criminal investigation, will rarely, if ever, be admissible under Rule 403. *See Janecka*, 937 S.W.2d at 473.

---

17. In the present case, the defense and the State entered into an agreement permitting the State to introduce victim-related testimony before the defendant introduced mitigating evidence. The defendant waived any objection related to the timing of the introduction of the State's evidence.

At the same time, we caution that victim impact and character evidence may become unfairly prejudicial through sheer volume. Even if not technically cumulative, an undue amount of this type of evidence can result in unfair prejudice under Rule 403. Hence, we encourage trial courts to place appropriate limits upon the amount, kind, and source of victim impact and character evidence.

 Finally, we observe that victim impact and character evidence is relevant only insofar as it relates to the mitigation issue. Such evidence is patently irrelevant, for example, to a determination of future dangerousness. The mitigation issue, on the other hand, asks whether, after considering *all* the evidence, *sufficient* mitigating circumstances exist to warrant imposing a life sentence instead of the death penalty. *See* Article 37.071 § 2(e)(emphasis added). Mitigating evidence is defined as that which "a juror may regard as reducing the defendant's moral blameworthiness." Article 37.071 § 2(f)(4). Victim-related evidence is relevant to show that the mitigating circumstances are not "sufficient" to warrant imposing a life sentence.[18] Such evidence

---

18. Relying upon *Eldridge v. State*, 940 S.W.2d 646, 653–654 (Tex.Crim.App.1996), *McFarland v. State*, 928 S.W.2d 482, 518 (Tex.Crim.App.1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997), and *Lawton v. State*, 913 S.W.2d 542, 557 (Tex.Crim.App.1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996), Judge Meyers contends that aggravating evidence is irrelevant to the mitigation special issue. But *Eldridge*, *McFarland*, and *Lawton* did not directly address that question; instead, those cases focused on a defendant's argument that the United States Constitution required a burden of proof regarding aggravating circumstances. *See* above citations. But, the mitigation issue does not *require* the jury to consider or find any aggravating circumstances, and hence, no burden of proof upon the State was required. *See* above citations. While these cases have some language indicating that the mitigation question does not involve aggravating circumstances, such language should properly be viewed as simply observing that the issue does not *require* their consideration. Such an observation does not, however, preclude *permitting* the jury to consider aggravating factors in making its evaluation. We disavow any language in those cases that suggests otherwise.

Relying upon *Wolfe v. State*, 917 S.W.2d 270, 278 (Tex.Crim.App.1996), Judge Meyers contends that permitting consideration of aggravating circumstances within the mitigation issue makes it unconstitutionally open-ended. Judge Meyers apparently believes that *Wolfe*'s language to the effect that future dangerousness and other issues "limit" the jury's discretion to consider aggravating factors means that aggravating circumstances have no place in the mitigation special issue. But the passage relied upon by Judge Meyers immediately follows a quotation from the Supreme Court's opinion in *Penry v. Lynaugh*, 492 U.S. 302, 327, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *See Wolfe*, 917 S.W.2d at 278. That quotation refers to the requirement that "a sentencer's discretion to *impose* the death sentence" be narrowed. *Id.* (emphasis in original). The passage in *Wolfe* regarding "limits" on considering aggravating circumstances should be read as covering aggravating circumstances used to "im-

pose" the death penalty. The present case, however, involves aggravating circumstances used to determine whether the jury should "decline to impose" the death penalty, and *Wolfe*'s language about "limits" is not directed to that situation.

The difference between the two situations is illustrated by the Supreme Court's discussion of the difference between the eligibility and selection requirements in a death penalty case. All that is constitutionally required to *narrow* the sentencer's discretion is *one* aggravating factor that applies to a subclass of defendants convicted of murder. *Tuilaepa v. California*, 512 U.S. 967, 971–72, 114 S.Ct. 2630, 2634–35, 129 L.Ed.2d 750, 759 (1994). This requirement of at least one narrowing, aggravating factor is sometimes known as the "eligibility" requirement. *Id.* That eligibility requirement is satisfied in Texas by aggravating factors contained within the elements of the offense, the future dangerousness special issue, and sometimes, other "non-Penry" special issues. Without findings on those particular aggravating factors, a death sentence cannot be imposed. Once the eligibility requirement is satisfied, the only remaining requirement is a "selection" decision: permitting the sentence to exercise an "individualized" determination of whether a defendant should in fact receive a death sentence "on the basis of the character of the individual and the circumstances of the crime." *Id.* at 971–74, 114 S.Ct. at 2634–36, 129 L.Ed.2d at 759–760. This "selection" decision "must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability," *id* at 972–74, 114 S.Ct. at 2635–36, 129 L.Ed.2d at 760, but the Supreme Court has never precluded the use of aggravating circumstances as part of the process of an individualized determination of culpability. Such a process could hardly be considered "individualized" if half of the equation (relevant aggravating circumstances) were excluded. We simply recognize in the present case that the jury may consider aggravating factors in its selection decision. In determining whether to dispense mercy to a defendant after it has already found the eligibility factors in the State's favor, the jury is not, and should not be, required to look at mitigating evidence in a vacuum.

would be wholly irrelevant if appellant affirmatively waived submission and reliance upon the mitigation special issue. Although we have held that the former "deliberateness" special issue could not be waived by a defendant, even upon affirmative request, *Powell v. State*, 897 S.W.2d 307, 314–318 (Tex.Crim.App.1994)(plurality opinion); *Id.* at 318 (Clinton, J. concurring), the mitigation special issue is distinguishable. In *Powell*, we explained that "Article 37.071 required that a jury find, beyond a reasonable doubt, that appellant committed murder with 'deliberateness' before he could be sentenced to death." *Id.* at 316. The issue, in part, "define[d] capital murder punishable by death." *Id.* But the mitigation issue carries no burden of proof that must be carried by the State before a death sentence can be imposed. *Penry v. State*, 903 S.W.2d 715, 766 (Tex.Crim.App.), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). The issue, instead, confers upon the jury the ability to dispense mercy, even after it has found a defendant eligible for the death penalty. *See McFarland*, 928 S.W.2d at 520. Hence, a defendant can waive reliance upon and submission of the mitigation issue, and if he does, victim impact and character evidence would be irrelevant and hence inadmissible. Such a waiver must, however, be affirmative and express.

▮ With these considerations in mind, we turn to the present case. Appellant complains about the testimony of three witnesses who were related to the victims. Helen Wrag, Luva Congleton's niece, testified that her aunt

... was a happy person. She liked people.

Q. Did she ever meet a stranger?

A. No sir.

Q. Was that part of her personality that she did well with people?

A. Yes sir, she had people that ask for her [waitress] station.

(Bracketed material and ellipsis inserted). Appellant also complains about Tricia Kappan's testimony regarding Patricia Colter, Duane Colter, and Alvin Waller (Tricia's mother, stepfather, and father respectively):

Well, Mamma and Daddy still loved each other, but it was—they were like best friends. And when Mamma met Duane— that was—Mamma was—Mamma was his whole life. And they just—they were just all friends. Daddy lived in a trailer behind my mother's house. He was going through a tough time and needed a place to go. And so my mother had a travel trailer behind her house, and he stayed there. And a lot of the time, he just slept in the extra bedroom at the other end of the trailer where Mamma and Duane were. They were just all really good friends. And they hardly went anywhere without each other. They just were all very close.

And appellant complains about the emphasized portion of the following testimony from Tricia concerning Duane Colter:

Duane was a very special person to me. I was sixteen. I was already grown. But when my mother met him and introduced us, I was kind of shocked and everything, but the more I was around him, the more you just—*you just couldn't help but just love him to death. He was just so sweet. He was like a big kid, you know. He was just great.*

(Emphasis added).[19] Appellant also complains about the emphasized portion of the

---

*Wolfe* does not hold to the contrary, but if it did, it would be inconsistent with Supreme Court precedent.

Finally, Judge Meyers contends that *Armstrong v. State*, 718 S.W.2d 686, 695 (Tex.Crim.App. 1985) precludes the introduction of a victim's good character to rebut evidence of the defendant's good character. But in *Armstrong*, the evidence was introduced in support of the future dangerousness special issue. *See Id.* That there is no logical link between the two types of evidence within the framework of the future dangerousness issue does not mean the same holds true for the mitigation issue. The mitigation issue

concerns a defendant's moral culpability, and to a limited extent, the victim's good character is relevant to a culpability determination. *Armstrong* was, of course, decided before the application of the mitigation issue in capital cases in Texas. Moreover, to the extent that it may conflict with the admissibility of victim-related evidence, *Armstrong* was overruled *sub silentio* by *Johnson*.

19. We note that, in his brief, appellant quotes only the emphasized portion of this passage.

following testimony from Tricia concerning Patricia Colter:

> My mother was my sole supporter. *She had been through so much in her life* that I felt like anything that she was going to have to go through, that I was going to be there with her and I could go through it with her. There was some times, you know, when we would move away and my brother would stay with Grandmother, but I couldn't stand it. I was always afraid, you know, something might happen to her or she wouldn't be strong enough to pull through something. And so I would think, you know—I was just a kid, but I would think, you know, if I was there, I could—I could help her through it, you know, I could, you know pull her through. And then whenever I got married, it was like I just wanted to prove to her that I was a big girl and I could take care of myself and she need not think—you know, need not spend all of her money on me. *She was always buying things for everybody. And I kept—you know, I would just think if she wouldn't buy stuff for everybody else, you know, she could buy it for herself.* But I always thought I would be there to take care of her and she would be there to take care of me. And she was my right arm. She was my backbone.

(Emphasis added).[20]

Finally, appellant contends that the trial court permitted Robert Waller to read a poem about the victims. He provides no record references and we find no poem in the testimony. We do find a portion of testimony in which Robert read an earlier "victim impact" statement that he had made concerning the effects that his mother, father, and stepfather had on his life.

We find appellant's argument that the above evidence should have been excluded to be unpersuasive. While the evidence relates to some degree to the character of the victims, it is heavily intertwined with the impact of the victims' loss on family members. Moreover, the evidence appears in this case to serve the function of humanizing the victims rather than drawing unwarranted comparisons between them and other members of society. The State introduced just three witnesses to give testimony concerning the four victims of the incident, and the entire, combined testimony of these witnesses takes up a mere 34 pages in the court reporter's record. We find that admission of this testimony did not violate Rule 403.

Appellant also argues that the State improperly made a comparative judgment about the victims in closing argument. However, appellant did not object to the argument at trial. He cannot preserve error with respect to argument by objecting to evidence simply because the evidence and argument address similar subject matter. Tex.R.App. P. 52(a)(now rule 33.1(a)(2)(A)); *Anderson v. State*, 932 S.W.2d 502, 507 (Tex.Crim.App. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997)(argument error with regard to parole not preserved by requesting jury charge on parole issue). Points of error 1 through 4 are overruled.

In point of error 109, appellant contends that the trial court erred in excluding testimony from defense expert Dr. Jedlika regarding future dangerousness. In an offer of proof, appellant proffered the following testimony he wanted admitted:

(1) 98 percent of convicted murderers do not commit any more violent crimes within 15 years after release.

(2) An inmate becomes eligible for parole on a capital life sentence after 40 years.

(3) Very few people commit crimes over age 60; no measurable statistical difference exists between crime rates for 60–year–old murder convicts and 60–year–olds who have not committed a previous crime.[21]

(4) Murderers are less likely to kill prison guards than burglars are.

(5) Being a prison guard is not a dangerous occupation.

(6) The death penalty is not cost effective.

---

**20.** We note that, in his brief, appellant quotes only the emphasized portions of the passage, placing an ellipsis between them.

**21.** We do note that testimony was admitted from defense expert Louis–Victor Jeanty, a psychiatrist, that violence tends to decrease with age.

(7) There is no evidence that the death penalty has an additional deterrent effect over imprisonment.

(8) There is a difference as far as future dangerousness is concerned between serial killers and single transaction multiple murderers.

Dr. Jedlika did not offer any testimony concerning any characteristics peculiar to appellant. Items (5), (6), and (7) merely constitute attacks on the validity of the death penalty scheme and are, for that reason, irrelevant to the jury's factfinding task. *Rachal v. State,* 917 S.W.2d 799, 817 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996). Item (2) was given to the jury in its instructions. *See* point of error 103 below. Items (1), (3), (4), and (8) may be relevant in the context of expert testimony concerning the specific characteristics and background of the defendant and their effect on future dangerousness. *Matson v. State,* 819 S.W.2d 839, 851 (Tex.Crim. App.1991); *Rachal,* 917 S.W.2d at 817. But none of Dr. Jedlika's testimony related to appellant's characteristics and background; no questions, hypothetical or otherwise were asked regarding whether a person with appellant's characteristics would pose a future danger. Hence, the general testimony relating to recidivism was not shown to be relevant to appellant. Point of error 109 is overruled.

The judgment of the trial court is AFFIRMED.

MANSFIELD, J. filed a concurring opinion.

MEYERS, J. filed a dissenting opinion in which BAIRD J. joined.

OVERSTREET, J. filed a dissenting opinion.

PRICE, J. concurs in the Court's judgment.

MANSFIELD, Judge, concurring on court's own motion for rehearing.

Prior opinion withdrawn. For several years this Court has struggled to determine to what degree so-called "victim impact/character" evidence should be admissible at the punishment phase of a capital murder trial. The Supreme Court, in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), held the Eighth Amendment is not a *per se* bar to the admission of evidence of the victim's personal characteristics or the impact of his death on his loved ones.

[T]he testimony illustrated quite poignantly some of the harm that Payne's killing had caused; there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by defendant ... [A] state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne,* 111 S.Ct. at 2609.

I. Categories of Victim Impact/Character Evidence

The Supreme Court in *Payne* did not precisely define what constitutes victim impact/character evidence. Yet, in order to answer the question as to the extent such evidence should be admissible it is necessary to do so.

Victim impact evidence is evidence of the effect the death of the complainant has had on his or her family and friends. For example, in *Payne v. Tennessee* the grandmother of the surviving child victim testified at the punishment phase as to the effect on the child of the loss of his mother and younger sister. She testified further as to how the child (who was severely wounded during the attack on his mother and sister, both of whom died) cried often for his mother and asked about what happened to his baby sister. We have not been consistent on whether victim impact evidence is admissible. *See Ford v. State,* 919 S.W.2d 107 (Tex.Crim.App. 1996) (Mansfield, J., concurring); *Smith v. State,* 919 S.W.2d 96 (Tex.Crim.App.1996) (Mansfield, J., concurring); *Johnson v. State,* 1997 WL 209527, —— S.W.2d —— (Tex.Crim.

App.1997) (plurality op.) (Mansfield, J., concurring).

In my concurring opinion in *Johnson*, I stated:

> In order to avoid violation of the due process rights of the defendant and to minimize the risk of admission of irrelevant evidence (I duly note that victim impact evidence is by its nature, highly emotional and likely to have a significant impact on the jury), it is my opinion that only close family members (parents, grandparents, spouses and siblings) should be allowed to testify as to the victim's character and/or effect the victim's death has had on them. In the present case, the mothers of the victims testified as to the effect the loss of their sons has had on them as well as what kind of young men they were. Such evidence, testimony of close family members, is relevant under Rules 401 and 402, and is not excludable as prejudicial under Rule 403.

*Johnson, supra,* slip op. at 17, —— S.W.2d at ——.

I agree with the majority that allowing only close family members to testify as to the effect the death of the victim had on them may be, in certain cases, overly restrictive. Certainly, the effect of the victim's death on a lifelong friend, work colleague, or romantic partner may well be more traumatic in some instances than on a close family member. Not allowing these individual to testify merely because they are not related by blood, I am now convinced, would be unjust. Therefore, victim impact evidence should be admissible within the context of the special issues at a capital trial, and, like any other evidence, should be subject to Texas Rules of Criminal Evidence 401 and 402. Under Rule 403 victim impact evidence which is needlessly cumulative, or whose probative value is outweighed by the danger of undue prejudice would be subject to exclusion by the trial court, subject, on review, to an abuse of discretion standard. Certainly, a long parade of witnesses testifying as to the impact of the victim's death on them could, in some instances, be so cumulative and so prejudicial as to implicate the defendant's due process

rights; such is not an issue in the present case.

The second major category of victim-related evidence is victim character evidence. This evidence pertains to the personal attributes of the victim, e.g., she was generous and involved in charitable activities, was a good mother, or was successful and well-liked in the community. The purpose of such evidence is to inform the jury that the victim was more than just a name; he or she was a unique individual and had worth as such. *See Payne v. Tennessee,* 111 S.Ct. at 2607, 2609. The defendant is permitted to put into evidence before the jury at punishment a nearly unlimited range of evidence of his character and background as mitigating against imposition of the death penalty under Texas Code of Criminal Procedure, Article 37.071, § 2(e). Evidence of the victim's character and background is, in my opinion, equally relevant in the context of the mitigation special issue. As with victim impact evidence, the admissibility of victim character evidence is subject to Rules 401, 402 and 403. In the present case, I agree with the majority that the testimony of three witnesses related to the victims as to the victims' good character and the effect of their deaths on them was relevant victim impact/character evidence under Rules 401 and 402. Furthermore, the evidence was not needlessly cumulative, nor did its prejudicial effect outweigh its probative value, requiring its exclusion under Rule 403. Accordingly the trial court did not abuse its discretion in allowing the admission of this testimony.

With these comments, I join the opinion of the Court.

OVERSTREET, Judge, dissenting on court's own motion for rehearing.

Because the Court granted rehearing on its own motion, my prior opinion is withdrawn. After reading appellant's brief, the majority opinion of this Court, the concurring opinions, and the dissenting opinions, I am of the firm belief that the issues raised by appellant require additional briefing. As the court of last resort in Texas for criminal matters, we should not render a disposition of the issues as suggested by the majority

opinion.[1] The United States Supreme Court in various decisions has upheld the constitutionality of the Texas capital murder laws. Implicit is a requirement of meaningful appellate review for those cases wherein the death penalty has been assessed. It should be obvious to all that appellant, an indigent death row inmate, is working under unreasonable inflexible time restraints imposed by this Court in this case.

Even a strained sense of justice demands that we reorder briefing. Issues such as the actions of the trial judge toward appellant's African–American lawyers and the creation of a hostile and racially charged courtroom atmosphere have far ranging potential consequences regarding the disposition of this case.

Rather than rushing to injustice as the majority seems intent on doing, I would order appellate counsel to rebrief per Tex. R.App.Pro. 38.9, formerly Tex.R.App.Pro. 74(p). Afterwards, this Court can provide the constitutionally required due process of law by providing meaningful review. Because the majority chooses to do otherwise, I strongly dissent.

MEYERS, Judge, dissenting on court's own motion for rehearing.

The majority sets out a "consistent, if not always clear-cut rule": victim impact and victim character evidence are admissible at punishment in capital murder trials. Consistency and clarity are certainly laudable goals in appellate jurisprudence. But the law should come first. The problem with the majority's "consistent and clear-cut" rule is that victim impact and victim character evidence is simply not relevant to the mitigation special issue as prescribed by the Texas Legislature. I dissent to the Court's failure to exercise judicial restraint; I decline to legislate.

1. The majority dismisses 64 of appellant's 173 points, 36.99%—well over one-third, as inadequately briefed.

1. This is distinguished from non-capital cases, where evidence is admissible as to "any matter the court deems relevant to sentencing." Tex. Code Crim. Proc. art. 37.07 § 3(a) (regardless of

Evidence is generally admissible at punishment in capital cases in Texas if it is "relevant" to the "special issues" for consideration by the jury. Tex.Code Crim. Proc. art. 37.071; *McDuff v. State*, 939 S.W.2d 607, 620 (Tex.Crim.App.1997)("[a]dmissibility [of victim impact evidence] is determined by the terms of the Rules of Criminal Evidence, particularly whether such evidence is relevant to the statutory special issues"); *Bell v. State*, 938 S.W.2d 35, 49 (1996)("[d]uring the punishment phase of a capital murder trial, evidence may be presented on any matter the trial court deems relevant to answering the special issues"), *cert. denied*, —— U.S. ——, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997); *Banda v. State*, 890 S.W.2d 42, 61 (1994)("[d]uring the punishment phase of a capital murder trial, evidence may be presented on any matter that the court deems relevant to answering the special issues"), *cert. denied*, 515 U.S. 1105, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995); *Ex parte Broxton*, 888 S.W.2d 23, 28 (Tex.Crim.App.1994)(extraneous offense evidence admissible "to the extent [it is] relevant to prove the special issues), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).[1] Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Crim. Evid. 401. And, "[a]ll relevant evidence is admissible, except as provided by constitution, by statute, by [the rules of evidence] or by other rules...." Tex.R. Cr. Evid. 402.

The majority says victim impact and victim character evidence is relevant to the following mitigation special issue:

[if the jury answered the previous special issue in the affirmative, the jury is instructed to answer the following issue:] [w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character

whether punishment is "assessed" by judge or jury, evidence may be offered as to "any matter the court deems relevant to sentencing"). Capital punishment jurors do not "assess punishment," but are asked to make specific fact-findings; thus, the evidence must be relevant to those fact issues.

and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*See Majority op.* at 262 (observing victim evidence "is relevant only insofar as it relates to the mitigation issue"). Therefore, if evidence about the victim's character or the impact of the crime on the victim's relatives or close friends has any tendency to make more or less probable that a sufficient mitigating circumstance or circumstances will warrant a sentence of life imprisonment *rather than* a death sentence, then such evidence is admissible.

The majority appears to offer two explanations as to how victim evidence is relevant to the mitigation special issue. At first, the majority says victim impact and character evidence are "admissible ... to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." *Majority op.* at 262. But the "uniqueness of the victim [and] the harm caused by the defendant" are merely descriptions of what victim character and victim impact evidence are. Thus, the majority holds that victim character and victim impact evidence are admissible to show victim character and victim impact. This circular holding says nothing about how it is that such evidence is "relevant" to the mitigation special issue under the Rules of Criminal Evidence.

In further explanation, the majority says "victim-related evidence is relevant to show that the mitigating circumstances are not 'sufficient' to warrant imposing a life sentence." *Majority op.* at 263. In other words, evidence of the victim's character and the impact of the crime on the victim's friends and family tends to make it more or less probable that the defendant's mitigating evidence will not be enough to warrant a life sentence. The most obvious problem with this reasoning is that it factors in new aggravating evidence (apart from the aggravating evidence offered in support of a finding of future danger), which we have repeatedly and unequivocally said is contrary to the

plain language of the mitigation special issue and inconsistent with the way the Legislature has structured the special issues.

The first two special issues serve the *narrowing* function of defining the class of death eligible persons and thus are the only issues to which aggravating evidence is relevant. Tex.Code Crim.App. art. 37.071 § 2(b). The mitigation issue, however, compels the jury to inquire whether there might be some reason for *sparing* the defendant's life. Aggravating evidence has no relevance to this question. *Id.* at § 2(e).

In an eight-one opinion rendered just over one year ago, with rehearing denied nearly a year ago to this date, the Court stated unequivocally that aggravating evidence is not relevant to the mitigation special issue. *Eldridge v. State,* 940 S.W.2d 646, 653–54 (Tex. Crim.App.1996). There, the defendant argued the mitigation issue was unconstitutional because "it assign[ed] no burden as to aggravating circumstances." We were perplexed by the argument:

It is unclear what appellant means by this; we can only speculate. He might be referring to the aggravating circumstances considered under Article 37.071 § 2(b), i.e. future dangerousness. But the burden as to future dangerousness is expressly assigned to the State.... Alternatively, appellant might mean that there is a balancing of aggravating and mitigating circumstances inherent in the requirement in Article 37.071 § 2(e) of consideration of a defendant's individual circumstances and personal moral culpability. *Appellant does not explain how § 2(e) implicitly calls for aggravating circumstances when the plain language of the statute does not.*

\* \* \*

*More importantly, appellant does not explain why § 2(e) would necessarily call for a consideration of non-statutory aggravating evidence when the necessary narrowing function has already been taken care of under § 2(b). On its face, Article 37.071 § 2(b) is the only part of the statute that involves aggravating evidence. The issue of future dangerousness is com-*

pletely independent of the special issue under § 2(e). The capital jury is told that it cannot answer the special issue until it has unanimously answered the first "yes," beyond a reasonable doubt. At this point, it is instructed to determine whether, in spite of its finding beyond a reasonable doubt that appellant would represent a continuing threat to society, the circumstances of appellant's crime and life nonetheless call for leniency, i.e., a life sentence. The purpose of the second special issue from appellant's perspective is not to rebut the affirmative answer to the first special issue. Rather, the purpose is to determine whether the individual circumstances of appellant's case and background call for sparing his life, even though the jury has found that he may be a continuing threat to society. *Because § 2(e) does not contemplate aggravating factors, its silence as to the burden of proof on aggravating factors does not make it constitutionally infirm.*

*Id.* at 653–54 (emphasis added). The Court could not have stated more clearly its view that under the "plain language" of section 2(e), aggravating evidence is not relevant.

In another eight-one opinion, this one sponsored by the author of the majority today, the Court emphasized that the jury's discretion to consider aggravating evidence must be narrowed (and has been, per the future dangerousness issue and by defining the crimes for which the death penalty may be imposed), while discretion to consider mitigating evidence should be open-ended (and is, per the statutory *Penry* issue):

> [A]ppellant argues that the failure of the statutory *Penry* issue [ ] to assign a burden of proof permits open-ended discretion in violation of the Eighth Amendment.... The "open-ended" objection was leveled at *Penry* itself, and the United States Supreme Court responded:
>
> > "In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to

narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline it to impose* the death sentence." *Penry v. Lynaugh,* 492 U.S. 302, 327, 109 S.Ct. 2934, 106 L.Ed.2d 256.... *The future dangerousness special issue and other non-Penry special issues, along with the specifically enumerated murder situations which constitute capital murder, limit the jury's discretion to consider aggravating factors. As noted above, it is appropriate not to limit a jury's discretion concerning mitigating factors.*

*Wolfe v. State,* 917 S.W.2d 270, 278 (Tex. Crim.App.1996). Thus, if the mitigation issue allows for consideration of aggravating evidence, it is unconstitutionally open-ended.

In *McFarland v. State,* 928 S.W.2d 482 (Tex.Crim.App.1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997),[2] we rejected the defendant's argument that the State should shoulder the burden of proving aggravating factors under Article 37.071 § 2(e), because that issue simply "does not involve consideration of aggravating factors":

> But the special issue under § 2(e) does not involve consideration of aggravating factors. The necessary narrowing function has already been taken care of under § 2(b). Thus, there is no burden of proof as to aggravation to assign at the § 2(b) stage of the proceedings.

*Id.* at 518.

In *Lawton v. State,* 913 S.W.2d 542, 557 (Tex.Crim.App.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996), we once again rejected an argument that the mitigation issue should assign a burden of proof "as to aggravating or to mitigating circumstances," because that issue "does not ask the jury to consider aggravating evidence."

The majority now neatly "disavows" any such language in these opinions. They argue "the Supreme Court has never precluded the use of aggravating circumstances as part of the process of an individualized determina-

---

**2.** Two of the points of error in *McFarland* garnered only a plurality vote, but the Court's opin-

ion on this issue was supported by seven judges.

tion of culpability" and say "we" "recognize . . . the jury may consider aggravating factors in its selection decision." They miss the point. Supreme Court precedent does not prohibit consideration of aggravating circumstances in the context of the mitigation issue; rather, the plain language of the statute passed by the legislature does not allow for it. The legislature has the option to rewrite the statute; this Court does not.[3]

Apart from this caselaw, today disavowed, the other disturbing aspect to the majority's reasoning is that it is a direct invitation to conduct a comparative worth analysis. But the majority says this is not permissible. *Majority op.* at 262. This is also the problem with the majority's holding that victim evidence is relevant *to rebut* the defendant's admission of mitigating evidence. *Id.* at 262. The majority suggests that by offering evidence of *his own* character or circumstances, the defendant places into issue *the victim's* character or circumstances. But proper rebuttal evidence in the context of the mitigation issue should go to the defendant's character or circumstances not the victim's. We recognized this principle in *Armstrong,* supra. There, after defense witnesses testified at punishment to the defendant's good reputation for being peaceful and law-abiding, the State called the deceased's wife to testify, in rebuttal, that the deceased had been a peaceful and hardworking man. She testified she and the deceased had been married nearly twenty-two years and had five children. She further testified that the deceased had never

missed a day of work, had been a good husband and father, had been nice to everyone including others of different races, and had enjoyed many friends. *Armstrong,* 718 S.W.2d at 696–97 (op. on reh'g). The State also introduced a family picture and elicited the names and ages of the children. We said the defendant correctly stated the following rule:

> It is never competent for the State in the first instance to prove that the person slain was peaceable and inoffensive. Such evidence becomes admissible in rebuttal when the opposite has been testified to in behalf of the defense, or when the defendant seeks to justify the homicide on the ground of threats made by the deceased.

*Id.* at 695 (opinion on original submission). But the fact that defense witnesses testified to *the defendant's* reputation did not raise an issue as to the reputation or character of *the deceased. Id.* at 696. We reaffirmed this holding on rehearing, emphasizing "the State may not introduce evidence of the deceased's good character unless *that character* has somehow been placed in issue by the defendant." [4] *Id.* at 697 (op. on reh'g)(emphasis added).

Finally, the majority says the defendant can affirmatively waive "reliance and submission" of the mitigation issue, and thus avoid presentation of victim impact and character evidence. *Majority op.* at 264. But submission of the mitigation issue to the jury is legislatively mandated:

---

3. The majority cites no authority to support its holding. When faced with authority which would compel a different result, the majority predictably responds by overruling it. *Cf. Proctor* and *Lemell v. State,* 967 S.W.2d 840 (Tex.Crim.App.1998)(overruling cases contrary to holding); *Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App.1997)(overruling "Benson/Boozer line of cases); *Ex parte McJunkins,* 954 S.W.2d 39 (Tex.Crim.App.1997)(recalling mandate in order to overrule *Ex parte Sims,* 868 S.W.2d 803 (Tex.Crim.App.1993) ); *Guzman v. State,* 955 S.W.2d 85 (Tex.Crim.App.1997)(*DuBose v. State,* 915 S.W.2d 493 (Tex.Crim.App.1996), *State v. Carter,* 915 S.W.2d 501 (Tex.Crim.App.1996) and *Arcila v. State,* 834 S.W.2d 357 (Tex.Crim.App. 1992) overruled); *Ex parte Wilson,* 956 S.W.2d 25 (Tex.Crim.App.1997)(overruling *Ex parte Jarrett,* 891 S.W.2d 935 (Tex.Crim.App.1994) ).

4. The majority says *Armstrong* is distinguishable because that case involved the future dangerousness issue, not the mitigation issue:

> That there is no logical link between the two types of evidence within the framework of the future dangerousness issue does not mean the same holds true for the mitigation issue. The mitigation issue concerns a defendant's moral culpability, and *to a limited extent, the victim's good character is relevant to a culpability determination.*

*Majority opinion* at 263 fn. 18 (emphasis added). What does "a limited extent" mean? And *how* is the victim's character relevant to a culpability determination? The majority's opinion illustrates how difficult it is to articulate the relevance of victim evidence without suggesting a comparative worth analysis.

The court *shall instruct* the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it *shall answer* the following [mitigation] issue[.]

TEX.CODE CRIM. APP. art. 37.071(e). The majority says the mitigation issue is distinguishable from other special issues (which we have held cannot be waived) because the mitigation issue does not impose a burden of proof on the State and it inures to the benefit of the defendant. *Majority opinion* at 264. The statute makes no exception on these grounds. In *Powell v. State,* 897 S.W.2d 307, 317 (Tex.Crim.App.1994), we held the defendant could not waive submission of the special issue on deliberateness:

> Before the sentence of death can be imposed upon appellant a jury must affirmatively determine that appellant's lethal conduct was "deliberate." Art. 37.071(b).... [A]ppellant could not consent to a sentence of death that was not authorized, and in fact, is contrary to the statutory mandate. *See also Casias,* 503 S.W.2d at 263 (Defendant may not waive requirement that he be present at sentencing).

The fact that the State does not bear a burden on the mitigation issue does not transform the mandate that the trial court "shall instruct" on the issue into providing that it "may instruct" on it. The plain language of the statute requires that the issue be submitted and, if the other issues are answered affirmatively, that the jury consider and answer it. The majority's holding otherwise is contrary to the face of the statute and encourages defendants to decline to offer mitigating evidence in an effort to preclude the State from offering victim impact and character evidence. And this might be advisable in order to avoid inviting the jury to engage in comparative worth analysis.

For instance, a defendant who has evidence of mental retardation can forego proffering that evidence rather than bear the risk of the State responding with evidence of the brilliance and character of the victim. I still don't understand how this evidence regarding the victim "tends to make it more or less probable" that this defendant's mental retardation will warrant a sentence of life....

Judge Clinton's words on this subject remain among the most sensical:

> Before we can meaningfully approach the question of admissibility of "victim impact" evidence under the rules of evidence, we must clearly define the issue. It does not facilitate the analysis to ask whether a whole category of evidence is admissible under the rubric of "victim impact." Instead, the trial court must take proffered evidence as it comes, inquiring on a case-by-case basis whether that evidence is relevant to any of the special issues in Article 37.071, which serves to circumscribe and define the parameters of the litigation at the punishment phase of a capital murder trial. Upon an objection to the relevance of any evidence that might be described as "victim impact," the trial court must ask, as it would of any other evidence: Does it tend to make more or less probable that any of the special issues should be answered one way or the other? Tex.R.Cr. Evid., Rules 401 & 402. If the court concludes it is relevant, upon further objection it may be called upon to decide: Is the probative value substantially outweighed by the danger of unfair prejudice? Tex. R.Cr.Evid., Rule 403.[5]

*Ford v. State,* 919 S.W.2d 107, 119 (Tex.Crim. App.1996) (Clinton, J., dissenting).

Because the evidence at issue here is not relevant to the mitigation special issue, the trial court erred to admit it.[6] Its admission

---

**5.** The majority's allegiance to Rule 403 rings hollow in light of its failure to address the preliminary question of relevance under Rules 401 and 402.

**6.** I joined the Court's opinion in *McDuff v. State,* 939 S.W.2d 607 (Tex.Crim.App.1997), but in retrospect, should have been shown as concurring. At issue was testimony by the victim's sister about the effect of the murder on her life. The

Court recognized some of the impact evidence as relevant to the defendant's moral culpability. *Id.* at 620. But the mitigation special issue does not permit any evidence, aggravating or mitigating, that bears on the defendant's moral culpability, only such evidence as would "warrant that a sentence of life imprisonment rather than a death sentence be imposed." Nonetheless, the admission of such evidence in that particular case was harmless.

 

affected a substantial right of appellant and thus was not harmless.[7] Tex.R.App. Proc. 44.2. This case should be remanded for a new punishment hearing. I dissent.

BAIRD, J., joins.

---

7. As this opinion is a dissent rather than an opinion for the Court, I will not labor to set out my harm analysis.