Raul Fernando Mendoza v. The State of Texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-162-CR

RAUL FERNANDO MENDOZA APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 211
TH
 DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted Appellant Raul Fernando Mendoza of murder and assessed his punishment at thirty-five years’ confinement in the Institutional Division of the Texas Department of Criminal Justice.  The trial court sentenced him accordingly.  In four issues, Appellant (1) contends that the trial court erred by denying his motion to suppress, (2) challenges the legal and factual sufficiency of the evidence, and (3) argues that he was denied effective assistance of counsel at trial.  Because we hold that the evidence is both legally and factually sufficient, that the trial court did not reversibly err, and that Appellant failed to prove his ineffective assistance claim, we affirm the trial court’s judgment.

Statement of Facts

Appellant and the complainant, Erika Gonzalez, were living together with Appellant’s parents in Lewisville.  On January 10, 2003, Appellant and Erika argued about Erika’s cheating with her estranged husband.  Appellant claimed that, following the argument, while he was getting a glass of water on the first floor, Erika became unconscious while in the bathtub on the second floor.  Appellant called 911, and Officer Nadia Ebeid was dispatched to Appellant’s house, where she spoke with him.  Detective Eddie Barrett also interviewed Appellant at the house and obtained an oral statement from him.  When the paramedics arrived, Erika was still unconscious.  Detective Javier Carcano obtained written consent from Appellant and his parents to search the house.  Detective Carcano then drove Appellant to the Lewisville Police Department, where Appellant provided a written statement.  After providing the statement, Appellant was initially arrested for suspicion of aggravated assault.  Erika died the following day, and it was determined that her death was caused by compression of the chest and/or strangulation.  Appellant was then booked in and charged with Erika’s murder.

Motion to Suppress

In his first issue, Appellant argues that the trial court erred by denying his motion to suppress his statements, which he contends that the police obtained “in violation of his Fourth and Fifth Amendment rights to the United States and Texas Constitutions.”  Appellant gave statements to Officer Ebeid and to Detectives Barrett and Carcano.  Appellant’s motion to suppress was heard after the trial had begun.

Officer Ebeid testified before the jury prior to the hearing on Appellant’s motion to suppress.  Her testimony included conversations with Appellant about what might have happened to Erika.  The sole objection Appellant made to Officer Ebeid’s testimony regarding the conversation that she had with Appellant was that the testimony was hearsay.  Appellant did not object that the statement was involuntary or that it was a custodial statement given without benefit of 
Miranda
(footnote: 2) warnings.  Thus, he has failed to preserve his complaint as to statements he made to Officer Ebeid.
(footnote: 3)
 The State introduced Appellant’s written statement into evidence through Detective Carcano.  Detective Carcano testified that Appellant’s written statement was made voluntarily after Appellant had been informed of and had waived his 
Miranda
 rights.  Although Appellant made oral statements during the time that he was drafting his written statement, the State did not attempt to offer the oral statements.  After Detective Carcano testified at the suppression hearing, defense counsel stated to the court that he did not object to the admission of the written statement but that any previous oral statement should be suppressed.  Later, before the jury, Appellant specifically stated that he had no objection when the State offered the written statement into evidence.  Appellant, therefore, has failed to preserve any complaint regarding his written statement.
(footnote: 4)
 We agree with the State that the true issue before the court is whether the oral statements to Detective Barrett should have been suppressed.  We employ a bifurcated standard of review, giving almost total deference to the trial court’s determination of historical facts and reviewing de novo the trial court’s application of the law to those facts.
(footnote: 5)
 Detective Barrett testified as follows outside the jury’s presence about Appellant’s oral statements to him at the crime scene:

Q. And what did he say to you?

A. He said that he was – he and Erika were living together at the home in the upstairs bedroom; that they had had an argument; that after the argument he went downstairs and — to get a glass of water; that he was down for a few minutes, went back up, and he found Erika in the bathtub not breathing.

Q. Okay.  And did he say anything else to you there at the scene?

A. He — when I asked him, “Well, what do you think happened to her?”, he said that she might have taken something.  He said the argument was over — they were at a bar the night before, and she had left him.  And when they — when they got up, they had an argument about it.  And then she had told him that he — she was sleeping with her estranged husband.

Detective Barrett testified that he did not consider Appellant free to leave at the time that he provided a statement because Appellant had become a suspect and was subject to investigative detention.  Detective Barrett did not inform Appellant, however, that he was not free to leave.  The officer’s subjective view of a defendant’s freedom to leave is not determinative of the question of whether the defendant was detained.
(footnote: 6)
 We look, therefore, to all the factors concerning Appellant’s discussion of the facts surrounding Erika’s death.
(footnote: 7)  Appellant called 911 to report that Erika was not breathing.  It therefore was objectively reasonable that emergency and law enforcement personnel would appear at his residence to investigate.  It was also objectively reasonable that police would seek to discuss with Appellant the circumstances surrounding Erika’s having stopped breathing.  The discussions with Detective Barrett took place in Appellant’s front yard, and although Detective Barrett did not advise Appellant of all of his constitutional rights, he did advise Appellant that he did not have to answer his questions.  Earlier, Appellant had walked off while Officer Ebeid was talking to him.

The police asked Appellant whether he was willing to go to the police station to give a statement.  They asked his mother and stepfather to go as well.  Although the police transported Appellant to the police station, the record reflects no threats that he would be taken forcibly if he refused to go voluntarily.  Case law suggests that the mere fact that the officers provided transportation is not conclusive evidence that the individual is in custody.
(footnote: 8)  We conclude that the record before this court does not reflect any circumstances that would cause an objective and reasonable person in Appellant’s position to believe that his freedom of movement had been restricted to the degree that he was not free to leave.

Additionally, we note that the only new evidence provided by Detective Barrett’s testimony about Appellant’s oral statements was that Appellant and Erika had been involved in an argument at the bar the evening before and that Erika had left him that evening.  Officer Ebeid had already testified that the reason for the argument was Erika’s admission to Appellant that she had cheated on him with her estranged husband and that Appellant claimed that he had gone downstairs to get a glass of water and had found Erika unconscious in the bathtub when he returned upstairs.

Based on the record before this court, we hold that the trial court did not err by admitting Appellant’s oral statements made to Detective Barrett.  Because we have upheld the admission of all of Appellant’s challenged statements, we overrule Appellant’s first issue.

Legal and Factual Sufficiency of the Evidence

In his second and third issues, Appellant challenges, respectively, the legal and factual sufficiency of the evidence supporting his conviction. Erika’s sister Yolanda Gonzales testified that on January 10, 2003, she received a phone call from Appellant.  Appellant told her that he and Erika had gotten into a fight and that Erika had told him that she was cheating on him.  According to Appellant, Erika had committed suicide.  He claimed that after he and Erika had fought, he left her in the bathroom and went downstairs, but that when he went back upstairs, he found her in the bathtub, and she was blue. Anthony Castille, a neighborhood friend of Appellant, testified that on January 10, 2003, Appellant had come to his door looking sad and upset, saying that his girlfriend was not breathing and that he needed to get help.  Castille and his brother went to Appellant’s house and found Erika  unconscious, lying in a bathtub in less than a foot of water.  During this time, Appellant was talking to the 911 operator who instructed the men to lift Erika out of the tub and to begin CPR.  The men followed the instructions, and when paramedics arrived, they took over the CPR.

Castille noticed marks on Erika’s neck and thought it looked as though she had been choked.  His brother, however, thought the marks looked like hickeys.  Detective Barrett took photographs of Erika.  The photographs showed marks on her neck and petechiae (a collection of small bruises that look like purplish red dots) on her shoulders and face.

Officer Ebeid and Detective Barrett testified about their conversations with Appellant.  Appellant suggested to Detective Barrett that “maybe she took something.”  Appellant, his mother, and his stepfather consented to the police searching the house.  Detective Barrett did not find any prescription medication or narcotics that Erika could have taken, nor was there any sign of forced entry into the house.

The evening before, Erika had been drinking tequila.  She told Appellant that she missed her parents and wanted to be with them.  The next morning, Erika went to the bathroom.  She let the bathtub fill up halfway and then went back to the bedroom and told Appellant that she had been going out with a man and that they had had sex once.  Appellant called her a bitch, and Erika tried to slap him, but Appellant blocked her hand.  Appellant claimed that he hugged Erika to keep her from slapping him again.  He described the hug as

real hard around her right arm against her neck.  My arm, right arm[,] was holding her right arm against her neck.  Her left arm was trying to hit me.  And my left arm was holding her to calm[] her down and holding her right arm to and then I said that she had to calm down and she said ok.  Then she tried again to hit me and I hugged her again and told her I was going to take her to the restroom and let her calm down and I carried her to the restroom, so I did take her to the restroom and put her in front of the bathtub.  I told her that she had to calm down.  She did not say nothing so I let go of her and went out of the restroom and closed the restroom door and went downstairs.

The director of emergency medicine at The Medical Center of Lewisville, Dr. Stewart Coffman, was the attending physician when Erika was admitted.  He testified that Erika was unresponsive to stimuli, had no voluntary movement, was unable to breathe on her own, and had very low blood pressure.  She was suffering from a lack of oxygen flow, that is a lack of blood flow, to the brain.  Dr. Coffman noticed the petechiae across her shoulders and face.  The pattern of petechiae, according to Dr. Coffman, suggested that Erika had been placed in a chokehold or a stranglehold.  Dr. Coffman testified that the strangulation did not appear to be the result of a grip around the neck or a noose or any type of ligature but was more consistent with an arm chokehold.  In his opinion, the lack of oxygen flow to the brain was caused by the strangulation.  Dr. Coffman testified that to cause the brain injury sustained by Erika, the flow of oxygen would have been cut off for approximately six continuous minutes.  In his opinion, suicide was not a possibility because a person would become unconscious before enough time would elapse to cause death.

Parkland Memorial Hospital trauma surgeon Dr. Brian Eastridge testified that when Erika arrived at Parkland from the Lewisville hospital, she was unresponsive and that he noticed a multitude of petechial hemorrhages on her upper chest, face, and neck.  The petechiae from the neck up were consistent with strangulation by a chokehold.  The existence of petechiae on the chest and shoulders was consistent with pressure across her thorax or chest and could occur from someone holding her over a bathtub but not from someone simply lying her across the bathtub.  Dr. Eastridge also observed abrasions on the outside of Erika’s neck.  He agreed that the brain injury that he observed was consistent with oxygen deprivation for about six minutes.  He also testified that the petechiae in Erika’s case were consistent with traumatic asphyxia or a lack of blood flow back to the heart.

Dr. Walter Kemp, an adjunct medical examiner who conducted the autopsy, testified that he observed multiple petechial hemorrhages around Erika’s eyes.  This condition was consistent with strangulation.  Petechiae on Erika’s face and in a line on her shoulders and upper chest were consistent with significant compression of the chest.  In his opinion, a person’s body weight would not generate a sufficient force to cause such compression.  Erika’s sphenoid sinus cavity contained water, indicating that her head was underwater at some point.  He also observed cerebral edema, indicating to him that the brain was continuously deprived of oxygen for a significant amount of time, three or four minutes at a minimum.  Dr. Kemp also observed a bruise on the right side of Erika’s neck.  He listed “homicidal violence” as the manner of death.  Dr. Kemp concluded, based on the autopsy finding and the history available to him, that Erika died of asphyxia and that drowning may have contributed to her death.  Castille, the neighbor who saw Erika in the bathtub, testified that her head was near the nozzle and that her hair was wet.  Again, the record reflects that there was less than a foot of water in the tub.

Applying the appropriate standards of review for both legal
(footnote: 9) and factual
(footnote: 10) sufficiency, we hold that the evidence is sufficient to support a jury’s determination that with the intent either to cause the death of Erika or to cause serious bodily injury while committing an act or acts clearly dangerous to human life, Appellant caused Erika’s death.  We overrule Appellant’s second and third issues.

Ineffective Assistance of Counsel

In his fourth issue, Appellant argues that he was denied effective assistance of counsel because his trial counsel failed to (1) prepare adequately for trial; (2) object to the prosecutor’s opening statement; (3) request a limiting instruction pertaining to an answer giving by Erika’s sister; (4) cross-examine the 911 operator; (5) cross-examine extensively the paramedic who testified; (6) file a written motion to suppress rather than an oral motion; and (7) request a jury charge on the lesser included offense of manslaughter.

We note that an oral motion to suppress is usually sufficient
(footnote: 11) and generally not an indication of inadequate performance.  Regarding trial counsel’s failure to request a jury instruction on manslaughter, we note that there is no evidence to support an instruction on the lesser included offense of manslaughter because there is no evidence that Appellant behaved recklessly in causing Erika’s death.  Finally, as to the other allegations of inadequate performance by trial counsel, Appellant’s motion for new trial alleged only that the verdict was contrary to the law and the evidence.  No affidavits were attached, and the motion was denied without a hearing by operation of law.  Consequently, the record does not reveal the bases for the remaining challenged actions and omissions of trial counsel.  This court will not “reverse a conviction on ineffective assistance of counsel grounds when counsel's actions or omissions may have been based upon tactical decisions, but the record contains no specific explanation for counsel's decisions.”
(footnote: 12)  Accordingly, based upon the applicable standard of review,
(footnote: 13) we overrule Appellant’s fourth issue.

Conclusion

Having overruled Appellant’s four issues, we affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  July 28, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3:
See
 
Tex. R. App. P.
 33.1(a); 
Mendez v. State
, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004);
 Mosley v. State
, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
,
 
526 U.S. 1070 (1999).

4:
See
 
Tex. R. App. P.
 33.1(a); 
Mendez
, 138 S.W.3d at 341; 
Mosley
, 983 S.W.2d at 265.

5:
Maxwell v. State
, 73 S.W.3d 278, 281 (Tex. Crim. App.), 
cert. denied
,
 
537 U.S. 1051 (2002).

6:
Whren v. United States
, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996).

7:
See id.

8:
Anderson v. State
, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), 
cert. denied
, 521 U.S. 1122 (1997).

9:
See Jackson v. Virginia
,
 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); 
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).

10:
See Zuniga v. State
, 144 S.W.3d 477, 481-82, 484-87 (Tex. Crim. App. 2004); 
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

11:
See
,
 e.g.
,
 Wilkerson v. State
, 144 S.W.3d 150, 152 (Tex. App.—Fort Worth 2004, pet. ref’d & pet. granted).

12:
Bone v. State
, 77 S.W.3d 828, 830 (Tex. Crim. App. 2002).

13:
See Strickland v. Washington
, 466 U.S. 668, 687-90, 694, 104 S. Ct. 2052, 2064-66, 2068 (1984); 
Thompson v. State
, 9 S.W.3d 808, 812-14 (Tex. Crim. App. 1999).