COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-138-CR

 

 

NOLBERTO GURRUSQUEITA, JR.                                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 372ND
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

A jury convicted Appellant Nolberto Gurrusqueita,
Jr. of murder and assessed his punishment at forty years=
confinement in the Institutional Division of the Texas Department of Criminal
Justice.  The trial court sentenced him
accordingly.  In two points, Appellant
argues that the trial court erred by denying his motion to suppress and by
admitting as punishment evidence testimony regarding his juvenile criminal
record.  Because we hold that the trial
court did not err, we affirm the trial court=s
judgment.








Factual Background

On November 24, 2003, Benito Soto was shot and
killed at the Timber Ridge Apartments in Arlington, Texas.  Soto was a user and dealer of Aice,@ a
crystal form of methamphetamine.  According
to his fiancee=s testimony at trial, Soto had
left their apartment that evening to meet with Juan Gurrusqueita, Appellant=s
cousin, to buy drugs.  She testified that
Soto left the apartment around 6:30 p.m. carrying Athousands
of dollars@ and a 9mm automatic and wearing
a bulletproof vest.  He and Juan were
seen a short time later at a gas station located about a five-minute drive from
the apartment.

Oliverio Garcia, a resident of the Timber Ridge
apartment complex, testified at trial. 
According to his testimony, around dusk, he saw a man with something
tucked under his arm walking across the parking lot.  Garcia saw a white SUV, close to the man,
with an open door on the driver=s
side.  He saw Appellant, standing by the
SUV, fire several shots at the man. 
Garcia dropped to the ground and hid under his truck.  From there, he could see only Appellant=s feet
and legs.  He heard several more shots
and saw Appellant return to the SUV and drive away.








Police responded to 911 calls and found Soto=s body
at the foot of a stairway in the breezeway of the apartment building.  Investigators found several shell casings
near the body.  They did not find Soto=s pistol
or the Athousands
of dollars@ in cash.

Soto=s sister
gave the police some notes in Soto=s
handwriting, one of which contained driving directions to Rogers Street.  The directions do not contain the address A106@ but
instead have a number that could be A40@ or A406,@ but
they also say Alast left,@ and the
last house on the left is 106 East Rogers. 
That address is one that the police already had for Appellant.  Officers began surveillance of a house at 106
East Rogers Street and saw a white Suburban there two or three different
times.  Officers checked the vehicle=s
registration and discovered that although it was not registered to Appellant,
he had been issued several citations while driving it.  Officers obtained an arrest warrant for
Appellant and arrested him while he was driving the Suburban.  After the arrest, the police gave the media
Appellant=s mug shot.  The news outlets reported Appellant=s arrest
and showed the mug shot.  Garcia saw part
of the news clip on the arrest, although he testified that he did not see the
photo on the news.

The police spoke with Garcia and obtained a
statement from him about what he witnessed that night.  They showed Garcia a photographic lineup that
included Appellant=s mug shot, the same mug shot
that had been shown in the news.  Garcia
identified Appellant in the line up.








While in jail, Appellant told his cell mate that
he had Amessed
up by shooting somebody.@ 
The cell mate testified that Appellant had said that he had shot a man
wearing a bulletproof vest because the man had owed his cousin money and that
the man was supposed to buy drugs from him at a gas station.

Motion to Suppress








In his first point, Appellant argues that the
trial court erred by denying his motion to suppress because under the Atotality
of the circumstances@ test, the Afour
corners@ of the
arrest warrant affidavit did not provide sufficient probable cause to justify
the issuance of a warrant.  An arrest
warrant affidavit must provide the magistrate with sufficient information to
support an independent judgment that probable cause exists to believe that the
accused has committed a crime.[1]  In assessing the sufficiency of an affidavit
for an arrest warrant, the reviewing court is limited to the four corners of
the affidavit.[2]  The reviewing court should interpret the
affidavit in a common sense and realistic manner, recognizing that the
magistrate was permitted to draw reasonable inferences.[3]

The affidavit in this case, drafted and signed by
Detective Danny Nutt of the Arlington Police Department, is an excellent
example of a proper affidavit to support an arrest.  The affidavit provides in relevant part,

MY BELIEF AS AFORESAID IS
BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:

 

On or about 11-24-03, at
1405 Elite Circle (Timber Ridge Apartments) in Arlington, Tarrant County,
Texas, [Appellant] intentionally caused the death of Benito Soto by shooting
Benito in the head with a firearm, while in the course of committing the
offense of Robbery of Benito Soto.

 

Said offense was reported
by Cruz Rosas to the Arlington Police Department as Offense No. 030082507 on
11-24-03.

 

Among the Property
taken/involved during this offense was:

 

Stolen unknown brand 9mm
handgun, holster, magazines, and ammunition.

Stolen unknown brand
night vision monocular device.

Stolen $13,000.00
(approximately) in U.S. currency.

Stolen black front or
fanny pack.

Stolen black and tan back
pack.

Stolen gold rope necklace
with religious medallion.

 

[Affiant] has read
offense report 030082507 and learned the following facts and circumstances
concerning this case.

 








On Monday, 11-24-03, at
approximately 1924 hours, Arlington Police Officer D. Fulbright #2091 was dispatched
to 1405 Elite Circle, near apartment #216 of the Timber Ridge Apartments, in
response to a report of a shooting.

 

On arrival Officer
Fulbright discovered the body of a Hispanic male, later identified as Benito
Soto . . . lying on his back at the bottom of a short flight of stairs in the
courtyard directly East of building #1405. 
Benito Soto was found to be deceased and had apparent multiple gunshot
wounds to his head.  Several witnesses
reporting hearing gunshots, however there were no eye witnesses to the actual
shooting found.  A white Chevrolet
Suburban was observed leaving the location at a high rate of speed at the time
of the shooting.  Neighbors saw the white
Suburban leave the scene immediately after the shooting.  The Neighbors were interviewed and their
names are left out of the affidavits for their protection.  The scene was secured and Crime Scene and
Crimes Against Persons Detectives were requested.

 

[Affiant] was contacted
at 1939 hours and arrived on scene at 2039 hours. [Affiant], with the
assistance of Detective Frias, met with Crime Scene Officer Isbell and Tarrant
County Medical Examiners Investigator Clary. 
Several spent 9mm shell casings and projectiles were recovered from the
scene and entered into evidence. . . . An autopsy was performed on Benito Soto
by Tarrant County Medical Examiner Dr. Sisler on 11-25-03.  Benito Soto was found to have multiple
gunshot wounds to his head.  The manner
of Benito Soto=s death has been ruled a
homicide and the cause as multiple gunshot wounds.

 








On 11-26-03 [Affiant]
received a Tarrant County Crime Stoppers tip reference this homicide.  The anonymous informant advised the death of
Benito Soto involved an illegal drug transaction and that the suspect shooter
was a Hispanic male known as ABerto Gaona,@ who lives on E. Rogers Street in Arlington.  The informant advised Benito Soto tried to
run up the stairs, but was physically restrained by Berto=s unknown Cousin.  The informant stated Benito Soto begged for
his life, but that Berto shot Benito Soto in the head multiple times.  The informant gave the names of Berto=s Mother, Father, and
girlfriend, as well as other identifying information.  Using this information [Affiant] has identified
ABerto Gaona@ as [Appellant] through
Arlington Police Department computer records. [Appellant] shows to live at 106
E. Rogers Street in Arlington and has been handled by the Arlington Police
Department on several occasions, including investigations for drugsCdelivery of controlled
substance and an arrest for unlawfully carrying a weapon (firearm), and
murder.  The house at 106 E. Rogers Street
is known to the Arlington Police Department for drug and gang activity.  [Appellant] was issued citations by the
Arlington Police Department in August and October of 2003 driving a white 1994
Chevrolet Suburban with Texas license plate 8DRN03.  This same White Chevrolet Suburban has been
observed by [Affiant] and Detective Ford on several occasions parked in the
driveway of 106 E. Rogers Street since the death of Benito Soto.  None of the information reference the
multiple gunshots to the head of Benito Soto or the drug dealing scenario was
ever released to the media during this investigation.  [Affiant] learned that [Appellant] served 5
years in [TYC] for a 1994 homicide in Grand Prairie, Texas when [Appellant] was
15 years old.  The victim in the Grand
Prairie homicide was shot repeatedly in the head with a 9mm handgun in a
fashion similar to the shooting of Benito Soto.

 

[Affiant] and Detective
Ford have met with an informant who knew Benito Soto.  This informant fears retaliation if it is
learned that this informant is giving information about the case.  [Affiant] and Detective Ford have met with
this informant on several occasions and the informant has been fully
identified.  For the protection of the
informant and informant=s family, the identity of
the informant will not be revealed for purposes of this affidavit as the public
will have access to the affidavit.  This
informant has cooperated fully and has agreed to testify in the future . . .
.  This informant provided [Affiant] with
a written statement detailing these events.

 








The informant advised
Benito Soto was a drug dealer in East Dallas and Grand Prairie, primarily
dealing in Aice,@ a form of
methamphetamine.  The informant advised
that several days prior to his death, Benito Soto had run out of his supply of
ice and was looking for a connection to purchase more.  The informant stated Benito Soto was
attempting to do a large drug transaction with a subject known to the informant
as ATow Truck Juan.@  The informant advised Tow Truck Juan
attempted to meet with Benito Soto several days prior to Benito Soto=s death to arrange to
have Benito Soto meet with unknown subjects to purchase the drugs.  The informant advised Tow Truck Juan gave
Benito Soto directions to a location in Arlington, near Collins Street and
Rogers Street, where he was to meet with Tow Truck Juan and the other drug
supplier.  The informant advised this
meeting did not take place, however the informant advised Benito Soto wrote
down the directions to the meeting location in Arlington.

 

These handwritten
directions were found at the victim=s residence and are in the possession of
[Affiant].  Using these written
directions, [Affiant] and Detective Ford followed them to 106 E. Rogers Street
in Arlington.  The informant advised
further that on the night Benito Soto died, he had been picked up by Tow Truck
Juan and that Tow Truck Juan was taking Benito Soto to meet with drug dealers
in Arlington to purchase a large quantity of illegal methamphetamine.  The informant stated that when Benito Soto
left with Tow Truck Juan that Benito Soto was carrying a large amount of U.S.
currency to purchase the drugs and was carrying a[n] unknown brand 9mm handgun
in a holster around his waist, possibly a Beretta.  The informant added that Benito Soto was also
carrying a back and tan colored back pack that held a small monocular night
vision device, a black front or fanny pack, and that Benito Soto was wearing a
gold necklace with a religious medallion. 
Information obtained by [Affiant] and Detective Ford from a friend and a
family member of the victim has indicated Benito Soto was carrying
approximately $13,000.00 in U.S. currency at the time of his death, . . . which
he was going to use to purchase drugs. 
At the time Benito Soto was found dead, he was not found in possession
of the 9mm pistol and holster, the fanny pack, the back pack with the night
vision device, or the gold necklace with the medallion, or the $13,000.00.  Benito Soto was found to have only $295.00 in
his wallet, not the large amount he was reported to have left with.

 








[Affiant] and Detective
Ford were contacted by another anonymous informant who confirmed that Juan
Gurrusqueita was in fact attempting to introduce Benito Soto to Juan
Gurrusqueita=s Cousin so Benito Soto
could purchase illegal drugs from Juan Gurrusqueita=s Cousin.  This informant also fears retaliation and for
the purposes of this Affidavit will not be identified.  This informant has been fully identified and
has agreed to cooperate.

 

Tow Truck Juan has been
identified by [Affiant] and Detective Ford as Juan Gurrusqueita . . . .  [He] had originally been identified by
[Affiant] and Detective Ford as the subject who picked up Benito Soto and gave
him a ride just prior to his death.  Juan
Gurrusqueita advised he had dropped Benito Soto off on Pioneer Parkway and had
not known where Soto went from there. 
Juan Gurrusqueita admitted to [Affiant] that he was attempting to Ahook up@ or introduce Benito Soto
to his Cousin, [Appellant], so that [Appellant] could sell Benito Soto a
quantity of ice.  Juan Gurrusqueita has
identified a Texas drivers license photograph of [Appellant] as being his
Cousin he was trying to introduce to Benito Soto for the purpose of an illegal
drug transaction.

 

Within the four corners of the affidavit, Officer
Nutt set out the information he received and the lengths to which he went to
corroborate that information.  All
information received from untried informants is corroborated, and the
corroboration appears in the affidavit. 
The affidavit sets out in detail the bases for the officer=s claim
of probable cause to believe the crime was committed by Appellant and more than
adequately sets out probable cause to support the issuance of the warrant.  Because the underlying affidavit sufficiently
sets out probable cause to arrest Appellant for the murder of Benito Soto, we
overrule Appellant=s first point.








Evidence of Juvenile
Record

In his second point, Appellant argues that the
trial court reversibly erred by admitting at the punishment stage of the trial Atestimony
regarding [his] juvenile criminal history.@  Appellant=s
complaint concerns evidence offered by the State about an extraneous murder
that he committed as a juvenile.  But
Appellant=s mother and the mother of
Appellant=s girlfriend, both defense
witnesses at punishment, testified without objection that Appellant had
committed the prior murder.  Appellant=s mother
testified without objection that Appellant had shot a thirteen-year-old girl
and had been confined in the Texas Youth Commission from age fourteen to age
twenty-one.  Appellant=s
girlfriend=s mother testified that she had
known Appellant for five years and that she was aware that Appellant had
committed a murder in his past because her daughter had told her about it.

It is well settled that a trial court does not
reversibly err by admitting evidence over objection where the same evidence is
admitted elsewhere during trial without objection.[4]  We therefore overrule Appellant=s second
point.

 

 








Conclusion

Having overruled Appellant=s two
points, we affirm the trial court=s
judgment.

 

LEE
ANN DAUPHINOT

JUSTICE

PANEL B:   LIVINGSTON, DAUPHINOT, and WALKER, JJ.

PUBLISH

DELIVERED:  November 15, 2007











[1]McFarland v. State, 928 S.W.2d 482, 509 (Tex. Crim. App. 1996).





[2]Hankins v. State, 132 S.W.3d 380, 388 (Tex. Crim. App.), cert. denied, 519 U.S.
1119 (2004), overruled on other grounds, Mosley v. State, 983
S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998), cert. denied, 526 U.S. 1070
(1999); Jones v. State, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), cert.
denied, 507 U.S. 921 (1993).





[3]Hankins, 132
S.W.3d at 388; Jones, 833 S.W.2d at 124.

 





[4]Lane v. State,
151 S.W.3d 188, 193 (Tex. Crim. App. 2004); Leday v. State, 983 S.W.2d
713, 718 (Tex. Crim. App. 1998).