COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-207-CR

 

 

ERIC PAUL MICHAEL                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 371ST
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                     MEMORANDUM OPINION[1]
ON REMAND

 

                                              ------------








On original submission of this appeal, we
affirmed the decision of the trial court and held that, historically,
impeachment of a witness with prior inconsistent statements is always an attack
on the character of the witness, thus allowing rehabilitative evidence of
truthfulness under Texas Rules of Evidence 608(a).  Michael v. State, 173 S.W.3d 829, 833
(Tex. App.CFort Worth 2005), vacated,
235 S.W.3d 723 (Tex. Crim. App. 2007). 
On Michael=s petition for discretionary
review, the Texas Court of Criminal Appeals vacated our judgment and remanded
the case to this court, holding that Athe
question for the trial judge is whether a reasonable juror would believe that a
witness=s
character for truthfulness has been attacked by cross-examination, evidence
from other witnesses, or statements of counsel (e.g., during voir dire
or opening statements).@ Michael v. State, 235
S.W.3d 723, 728 (Tex. Crim. App. 2007)

I. Evidence and Procedural History

A.  Background and the Incident








At the time of the alleged incident, the
complainant, H.F., was spending the night in Michael=s home
as a guest of his two daughters.  Later
that night, Michael showed the girls a video tape called either ABanned
From TV@ or AFaces of
Death,@ each of
which portrays Aa compilation of filmed events
in which people get hurt, die.@  Michael=s wife
claimed that she stopped the playing of the video because of its content, even
though she never looked at it and never heard it.  H.F. and Michael=s two
daughters slept in a small guestroom on a pallet of sleeping bags. H.F.
testified that she awoke at 1:00 a.m. to find Michael kneeling beside her and Atouching
himself.@  She testified that he was not wearing a shirt
and that his shorts were pulled down. 
She indicated that she had been sleeping on her right side but that
Michael had rolled her over onto her back. 
Michael then grabbed her hand and pulled it toward himself. She stated
that he then moved to her feet, pulled down her shorts, and began licking her Avagina@
[sic].  H.F. testified that when she said
Avagina@ she
meant Afemale
sexual organ.@ 
Michael did not say anything while this happened, and H.F. just lay
there in shock.  She testified that after
five or ten minutes he stopped, pulled up her shorts, said Athank
you,@ and
left the room.

Later, Michael walked back into the room, and
H.F. asked to call her mother.  Michael
allowed her to place the phone call, but no one answered at her house.  Michael=s wife
testified that she heard the noise related to the phone call and came out of
her bedroom.  She said that Michael had
been sleeping in a chair in the living room, as he did from time to time.  She asked H.F. if she were having trouble
sleeping Ahaving nightmares or something,@ and
offered to let H.F. sleep with her.  H.F.
got into the bed with Michael=s wife
but did not fall asleep.  Eventually,
Michael got into bed on the opposite side of his wife.








H.F.=s mother
arrived around 8:30 the next morning to pick her up, and H.F. was crying.  H.F. told her mother that she was homesick
and had seen a scary movie.  H.F. did not
tell anyone of this incident until several months later, when, after watching
an episode of AThe Practice,@ she
told her mother.  The next day, H.F.=s mother
called Child Protective Services and took her daughter to the Grapevine police
department, where they filed a report. 
H.F. then gave a videotaped interview. 


Michael was subsequently indicted and tried for
sexual assault and indecency with a child. 
During cross-examination of H.F., Michael=s
defense counsel brought out discrepancies between H.F.=s
testimony at trial and the videotaped interview.  In rebuttal, the State called H.F.=s former
second grade teacher to offer testimony as to H.F.=s
character for truthfulness.  Michael=s
defense counsel objected to this testimony on the grounds that H.F.=s
character or credibility had not been attacked and that any testimony regarding
her character for truthfulness would be improper Abolstering.@  The trial court overruled the objection and
allowed the testimony of H.F.=s second
grade teacher.  

Michael was subsequently convicted of count 1,
sexual assault of a child under fourteen, and count 2, indecency with a child
by exposure, and sentenced under count 1 to sixty years=
confinement and under count 2 to ten years=
confinement.  This appeal followed.  

B.  Cross-examination of H.F.

H.F. was called by the State and was subsequently
questioned under cross-examination, in part, as follows:








[Defense Counsel]: Okay. Do you
remember after you told your mom that you went and spoke with a lady about what
had happened to you?  

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  Okay. 
And do you remember her telling you before you started talking about
this that there was a camera in the room?

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  Okay. And she told you that she was taping--

 

[H.F.]:  Yes.

 

[Defense Counsel]: -- the
interview, right?  

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  Okay. 
And do you remember her talking about how important it was to tell the
truth?

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  And, in fact, she even asked you about -- she
even gave examples?  

 

[H.F.]:  Yes.

 

[Defense Counsel]:  Okay. 
What -- what would be a truth and what would be a lie?  

 

[H.F.]:  Yes.  

 

. . . . 

 

[Defense Counsel]: Do you remember
what you told her?  

 








[H.F.]:  Yes ma=am.

 

[Defense Counsel]:  Okay. 
When you were talking to her, did you tell her that you were laying on
your left side and that [A.M.] and [J.M.] were on either side of you?[2]  

 

[H.F.]:  Yes, ma=am.  

 

[Defense Counsel]:  Okay. 
In fact, she had some little dolls, --

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  -- right? 
She had a female doll and a male doll?

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  Okay. 
And she gave you the female doll and asked you to show her how you were
laying?

 

[H.F.]:  Yes, ma=am.

 

[Defense Counsel]:  And you laid the doll on your left -- on its
left side?

 

[H.F.]:  Yes.

 

. . . . 

 

[Defense Counsel]:  Okay. 
And you -- you never said anything to her about being rolled over or
anything else, did you?[3]  

 

[H.F.]:  I don=t think so, no.








. . . .

 

[Defense Counsel]:  And y=all=s feet were down toward the --

 

[H.F.]:  TV.

 

[Defense Counsel]:  TV hutch. 
Okay.  And do you recall telling
the -- the -- the lady that you spoke with that you -- you had -- you never moved
off your left side?  

 

[H.F.]:  Yes, ma=am.         

 

. . . . 

 

[Defense Counsel]:  Okay. 
And now, were you -- were you on your side when all this was going on?

 

[H.F.]:  I think he had rolled me onto my back.

 

[Defense Counsel]:  Okay. 
But you didn=t say that when you were talking to
the lady?

 

[H.F.]:  Right.

 

[Defense Counsel]:  Okay. 
In fact, the lady asked you that question a couple of times, right?

 

[H.F.]:  I think so.

 

[Defense Counsel]:  Okay. 
And all -- and every time you told her that, you stayed on your left
side?

 

[H.F.]: Okay. Yes, ma=am. 


 

. . . .

 

[Defense Counsel]:  Okay. 
Now, when you=re describing everything that has
occurred to you, do you remember -- when you talked to the -- the investigator
who did the tape --








[H.F.]:  Yes.  

 

[Defense Counsel]:  -- the lady there at CPS, okay, do you recall
her asking you what Mr. Michael=s penis looked like? 


 

[H.F.]:  Yes, ma=am.  

 

[Defense Counsel]:  Okay. 
Do you remember what you told her?

 

[H.F.]: Yes, ma=am. 


 

[Defense Counsel]:  Okay. 
What was that?

 

[H.F.]:  I just told her it was sticking out like --
she asked me if it was sticking up or down or anything like that.  I just told her it was sticking out.  

 

[Defense Counsel]:  Okay. 
She asked you two questions.  The
first question was what it looked like. 
Do you recall telling her it looked normal?  

 

[H.F.]:  Yes.  

 

[Defense Counsel]:  Okay. 
Are you sure that you told her that it was sticking out?  

 

[H.F.]:  I think I told her it was sticking down.  

 

[Defense Counsel]:  That it was hanging down?  

 

[H.F.]:  Yes.  

 

[Defense Counsel]:  Okay. 
So your statement a minute ago that it was sticking out was incorrect?

 

[H.F.]:  Yes, ma=am.  

 

. . . .

 








[Defense Counsel]:  Okay. And she asked you -- do you remember
her asking you the question about, well, how did this happen if your legs were
here or here?  Do you recall that?   

 

[H.F.]:  Yes, ma=am.  

 

[Defense Counsel]:  Okay. And do you recall telling her that you
-- you weren=t sure --

 

[H.F.]:  Yes.

 

[Defense Counsel]:  -- how that happened?

 

[H.F.]:  Yes.

 

[Defense Counsel]:  Because of the position that you were in?

 

[H.F.]:  Yes.  

 

[Defense Counsel]:  Okay. 
And you weren=t sure?

 

[H.F.]:  Yes.

 

[Defense
Counsel]:  Okay.  And -- and you again stated that you still
didn=t see how he could have done what
he did because the room was so small? 

 

[H.F.]:  Yes. 

 

[Defense Counsel]:  And you were on your left side?  

 

[H.F.]:  Right. 


 

C.  The Objection to Stacy Turner

 

As set forth in the Court
of Criminal Appeals=s opinion, 

 








During rebuttal the State called Stacy Turner, H.F.=s former teacher and
babysitter, to testify about her opinion as to H.F.=s character for
truthfulness.  The trial defense counsel
objected stating that the character of H.F. had not been attacked:

 

I don=t believe we have
attacked the credibility of the child. 
It=s a issue of dates.  It=s a fact. 
It=s a fact issue for the
jury.  It=s not a question of
credibility.  We haven=t -- we haven=t brought the -- the
child=s character in -- into
question at all.  We -- merely state that
it didn=t happen, and that=s -- that=s just -- that=s our defense.

 

In response, the State
argued:

 

Oh, just for the record,
Your Honor, for the appellate lawyers, defense counsel went at great length
through the contents of the videotape with the victim indicating, well, you
said this then and you=re saying this now.  That kind of testimony absolutely opens the
door to rebuttal on grounds of truthfulness. 
If that is the fact, regardless of what is said, it=s an attack on credibility.

 

Michael, 235 S.W.3d at 725.

 

The objection was
overruled, and Turner testified.

 

D.  Testimony of Stacey Turner

Turner testified that she was H.F.=s second
grade teacher in 1998-1999 and that in December 1999, she had done some
babysitting for H.F.  Turner testified,
in part, as follows regarding the truthfulness of H.F.:

Q.  Do you have an opinion as to [H.F.=s] character for
truthfulness and -- do you have an -- an opinion?

 

A.  Yes.

 








Q.  And is your opinion of her character for
truthfulness good or bad?

 

A.  Good.

 

Q.  Thank you.

 

E.  Closing Argument

During closing argument, the prosecutor mentioned
the testimony of Turner on a single occasion:

You can look at [H.F.].  You
listened to her.  You listened to her
mother.  You listened to her second
grade teacher.  She is a well
brought-up child.  She is a well-mannered
child.  We even brought her school
records.  If there was anything in there
to indicate that she=s a liar, troublemaker,
or a problem, it would be in there.  This
is a well brought-up child who has no reason to lie and is not lying, and we
have brought you every bit of information to show that she is credible and
worthy of your trust and belief.  She is
worthy of it.  And there were no
witnesses from the defense  to say
otherwise.

 

If she was a liar and a problem
in the neighborhood, there would be witnesses here to describe her as
such.  They are not here because she=s not a
problem.  She is a truthful child.  So there=s no
vindictiveness, no grudges, no lack of stability. [Emphasis supplied.]

II. 
Standard of Review








An appellate court reviews a trial court=s
decision to exclude or admit evidence under an abuse of discretion standard.  Burden v. State, 55 S.W.3d 608, 615
(Tex. Crim. App. 2001); Green v. State, 934 S.W.2d 92, 101-02 (Tex.
Crim. App. 1996), cert. denied, 520 U.S. 1200 (1997); Montgomery v.
State, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990).  The test for abuse of discretion is not
whether, in the opinion of the reviewing court, the facts present an
appropriate case for the trial court=s
action; rather, it is a question of whether the court acted without reference
to any guiding rules or principles.  The
mere fact that a trial court may decide a matter within its discretionary
authority differently than an appellate court does not demonstrate such an
abuse.  Montgomery, 810 S.W.2d at
391.  The trial court=s ruling
will not be reversed on the admission of evidence as long as the ruling is
within the zone of reasonable disagreement. 
Id.

III. 
Analysis 

Assuming, without deciding, that the trial court
abused its discretion by allowing the testimony of Ms. Turner because a
reasonable juror would not have believed that H.F.=s
character for truthfulness had been attacked through her cross-examination, we
turn to the harm analysis to determine whether the assumed error calls for
reversal of the judgment. 








Under rule 44.2, if the error is constitutional,
we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt
that the error did not contribute to the appellant=s
conviction or punishment.  Tex. R. App. P. 44.2(a).  Otherwise, we apply rule 44.2(b) and
disregard the error if it did not affect the appellant=s
substantial rights.  Tex. R. App. P. 44.2(b); see Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999); Coggeshall v. State, 961 S.W.2d 639,
642-43 (Tex. App.CFort Worth 1998, pet. ref=d).

Because the assumed error is not of
constitutional dimension, rule 44.2(b) applies. 
See Tex. R. App. P.
44.2(b).  A substantial right is affected
when the error had a substantial and injurious effect or influence in
determining the jury=s verdict.  King v. State, 953 S.W.2d 266, 271
(Tex. Crim. App. 1997) (citing Kotteakos v. U.S., 328 U.S. 750, 776, 66
S. Ct. 1239, 1253 (1946)); Coggeshall, 961 S.W.2d at 643. 

Our
analysis is guided by the parameters set forth in Schutz v. State:

 

[N]either the State nor
appellant must demonstrate harm when an error has occurred.  Rather, it is the appellate court=s duty to assess harm
after a proper review of the record. . . . [T]he appellate court should
consider everything in the record, including testimony and physical evidence,
the nature of the evidence supporting the verdict, and the character of the
error and its relationship to other evidence. 
In addition, the appellate court may consider the trial court=s instructions to the
jury, the theories of the case that the State and defendant have espoused,
arguments to the jury and relevant voir dire. 
This very process of evaluating the entire record to determine whether
the error affected the jury=s verdict is the performance of a Rule 44.2(b)
harm analysis. . . . [T]his is the state of the law and we reaffirm it today.

 

Schutz v. State, 63 S.W.3d 442, 444-45
(Tex. Crim. App. 2001).

 

Evaluation of the record yields the following:

 








A.  Testimony

H.F. testified at trial at length that Michael
came into the room, removed his shorts and exposed himself, and performed oral
sex on her.  H.F. further testified that
she was up at 1:30 a.m. and asked if she could Acall
[her] mom@ because she Awas
scared that it would happen again.@  H.F. testified that she was Acrying,
and . . . was really upset@ the
next morning when her mom picked her up. 


H.F. further testified that she told the CPS
investigator during a videotaped interview that Michael had licked her vagina,
that he had exposed his penis to her with his pants down, and that he tried to
get her to touch him.

Carl Coats, a detective for the Grapevine Police
Department, testified that he was present in a separate room during the
interview given by the CPS investigator and was Aable to
watch and able to hear the interview from a monitor.@








H.F.=s mother
testified that H.F. had told her that A[H.F.]
woke up, and [Michael] was licking her vagina.@  H.F.=s mother
further testified that she Aremember[ed]
seeing a phone call [from Michael=s home]
on the Caller ID on the telephone . . . between 1:30 and 2 in the morning.@  H.F.=s mother
testified that she spoke with her daughter later that morning and Ashe just
seemed upset.  She wanted me to come get
her.@  H.F.=s mother
testified that when she arrived, H.F. Aran to
me and kind of clinged to me, a little bit sobbing.@

Araceli Desmarais, sexual assault nurse for Cook
Children=s
Medical Center, testified that H.F. stated to her that 

[H.F.] woke up, that
[Michael] was licking her vagina. [H.F.] said he was trying to make her touch
his penis, so she never touched it.  She
stated that he was on his knees and was holding his shorts down, and I asked
her if she had her clothes on or off. 
She said that he had taken her shorts off, but then later put them on.

 

Michael testified at trial and denied all
allegations against him and stated that A[he]
didn=t commit
no sexual acts.@ 
Michael testified that he did show the video ABanned
from TV@ to his
daughters and H.F.  Michael further
shifts the blame to his children for showing the video, as recounted in the
following:

Q.  Okay. 
And, in fact, sir, it was your idea to show this to a group of nine and
then seven-year-olds?

 

A.  No, that=s not exactly how it went. [A.M.] was talking
with [H.F.] AHey, my dad=s got this tape?@ [H.F.] turned around, AMr. Michael, can I see
that tape?@  She was so adamant to see this, bad judgment,
I figured, you know, tough girl, yeah, sure, why not.  I just threw it in there.

 

Q.  So you=re saying that the showing of that tape was [H.F.=s] fault, that you have
no responsibility for taking charge there with children?

 

A.  I didn=t say it was her fault.  It was her suggestion.

 








Michael also testified that H.F. was up at 1:30
a.m. asking to call her mother.

Michael=s wife
also testified that A[H.F.] woke up, and she wanted
to call her mother.@

B.  Closing Argument

The prosecutor reiterated during the closing
argument that H.F. testified that Ashe woke
up and [Michael was] over here [and] was licking her vagina. . . . She said he
used his tongue, and that was his mouth. 
She also told you that he exposed his penis and tried to touch it, and
she pulled away.@ 
The prosecutor went on to clarify that H.F.=s
recantation of events is Athe same story she told her mom
. . . [s]ame story she told Detective Coats and the other police officer.  It=s the
same story she told Araceli Desmarais from Cook=s
Children . . . .  It=s the
same story she told here.  It=s the
same story she told the CPS worker.@

C.  The Result








Considering the repeated statements of H.F. about
what occurred, the minimal testimony of Turner and solitary reference to the
testimony, and a review as directed by Schutz v. State, we conclude
that, in the context of the entire case against Michael, the trial court=s
assumed error in admitting the brief testimony of Turner did not have a
substantial or injurious effect on the jury=s
verdict and did not affect Michael=s
substantial rights.  See King, 953
S.W.2d at 271.  Thus, we disregard the
error and overrule Michael=s sole
point.  See Tex. R. App. P. 44.2(b).

IV. 
Conclusion

Having overruled Michael=s sole
point, we affirm the trial court=s
judgment.

 

BOB
MCCOY

JUSTICE

 

PANEL B:   HOLMAN,
GARDNER, and MCCOY, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: February 14,
2008

 











[1]See Tex. R. App. P. 47.4.





[2]H.F. testified during
direct examination that she had been sleeping on her right side. 





[3]H.F. testified during
direct examination that Michael had rolled her over.