**Affirmed and Memorandum Opinion filed April 27, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-21-00442-CR

**JAMES JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1593722**

## MEMORANDUM  OPINION

Appellant James Johnson appeals his conviction for murder. In two issues appellant contends (1) the trial abused its discretion in failing to grant either of his two motions for mistrial during the state's case-in-chief; and (2) the court costs associated with the judgment were improperly calculated.  We affirm the judgment of conviction and sentence, reverse a portion of the assessment of court costs, and remand for further proceedings limited to the assessment of costs.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The complainant, Ladisha Robinson, had four adult children—Demetre, Tatyana, Rodney and Markesha. On May 30, 2018, three of the children, Tatyana, Rodney, and Markesha, were hanging out at the pool at Markesha's apartment complex, the Esencia, along with their significant others and their children. Appellant was also at the Esencia apartment complex that day.

Rodney was in a relationship with Kailah Randle. Kailah testified that on her way up from the pool to join Rodney in Markesha's apartment she saw appellant, he grabbed her by the arm, and he tried to get her to talk with him. Kailah interpreted appellant's conduct as a romantic advance, and reported the encounter to Rodney, who knew appellant as a friend. Rodney, upset that appellant would make a pass at his girlfriend, planned to confront appellant and found him in a stairwell at the apartment complex.

Tatyana testified that she saw "[appellant] and my brother get in to it" so she physically got between appellant and Rodney in an attempt to break up the fight. After Tatyana broke up the fight, Rodney ran into the apartment and appellant pulled a black gun on her while her children were present outside and told her he was "going to shoot it."

Tatyana and her children went into the apartment and laid on the floor as appellant was calling Rodney on the phone and making threats. Markesha called the police, who came and took a report. Tatyana called complainant Ladisha and they planned for Ladisha to come pick up people from the apartment and take them home. Markesha's husband called the complainant's fourth son, Demetre, and told him about the situation. Demetre drove complainant to the apartment complex.

Tatyana and Tatyana's children loaded in the vehicle with Ladisha

Robinson. Demetre walked alongside the car to escort the passengers to safety. Tatyana and complainant Ladisha were in the front seat and the children were in the back. Ladisha was driving. Tatyana and Demetre both testified that appellant shot at the vehicle and that Demetre returned fire. The car driven by complainant crashed into a parked car. After the car crashed, Tatyana discovered that complainant had been shot and was unresponsive. Demetre testified that appellant fired at them "more than five" times.

*Focal issue at trial concerned the element of identity*

In addition to the family witnesses (Tatyana and Demetre), another witness, Marvin Bennett, identified the appellant as the shooter. Detective Lewis testified that before he took appellant's recorded statement, when he and Detective Grifno returned to canvas the apartments, they found and interviewed Bennett who told him that "[Demetre and appellant] both was [sic] wrong but [appellant] started shooting first."

At trial, appellant's counsel defense was that of mistaken identity based on the testimony of appellant's friend, Kerry Watson, and appellant's statement to the police (admitted through the testimony of the investigating officer, Detective Lewis). Amplifying an audio recording, Detective Lewis, recounted that appellant had told Detective Lewis that he had been at the apartment complex, that he had fought with Rodney earlier in the evening, but that two of his friends broke up the fight, and that he then went to his girlfriend's house, but returned to Estancia to show that he was not afraid to fight. Appellant had told Detective Lewis that he was present at the shooting, that he was shot at, but did not fire a shot, and explained that the shooting was from an unnamed individual shooting toward Demetre from behind appellant.

Though Watson's version of the facts was consistent with appellant's in that

3

appellant was not the shooter, his version differed from appellant's as he testified that he saw two other unnamed individuals were shooting, from a different direction in the parking lot. When questioned, Watson could not explain how Ladisha could have been shot from where he stated the shooting occurred.

*Conclusion of trial, verdict, and appeal*

After the close of the guilt-innocence phase the jury found appellant guilty and found true appellant's previous conviction for aggravated robbery with a deadly weapon. After separately hearing evidence on punishment, the jury assessed punishment at 40 years' confinement, and a $2,000 fine. The judgment also assessed court costs against the appellant that included consolidated fees from Government Code Section 134.101 applicable to convictions when the offense was committed on or after January 1, 2020. The trial court certified the appellant's right of appeal and the appellant filed a notice of appeal.

## II. MISTRIAL RULINGS

Appellant complains that the trial court erred in denying his two motions for mistrial. Appellant's counsel moved for mistrial several times, including the two instances after the court sustained appellant's objection that the State's prosecutor had impermissibly referred to his federal and state constitutional right to remain silent and refuse to testify. Both instances occurred during examination of witnesses before the close of the state's case-in-chief, and on both occasions the trial court denied appellant's motions for mistrial.

Commenting on an accused's failure to testify violates his state and federal constitutional privileges against self-incrimination. *Randolph v. State,* 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *See* U.S. Const. amend. V; Tex. Const. art. 1, § 10. Such a violation occurs when "the language used was manifestly intended or

was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011) (citing *Cruz v. State,* 225 S.W.3d 546, 548 (Tex. Crim. App. 2007)).

To evaluate whether the trial court abused its discretion in denying a mistrial for improper jury argument, the Court of Criminal Appeals, in *Hawkins v. State* adopted the three factors from *Mosley v. State*, which balance: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011) (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

**A. Did the trial court abuse its discretion in denying appellant's motion for mistrial during the examination of Demetre Robinson?**

Before appellant's first request for mistrial, both sides had questioned witnesses on the relative visibility in the alleyway where appellant was described to have come from at the time of the shooting. In cross-examining Demetre, appellant's counsel had Demetre agree that the surveillance videos were inconclusive in revealing appellant in the darkened area of the video. Demetre ultimately agreed that the video neither showed whether appellant was in the alleyway nor revealed the lighting conditions in the alleyway. On redirect examination, the prosecutor asked the following question:

> MS. THOMAS: Who are the only two people to your knowledge in this courtroom who would have been able to say and describe the conditions in that alley?
>
> MR. MARTIN: Objection, Judge. That's an improper question. And it

5

also comments on my client's right to remain silent.

THE COURT: That will be sustained.

---

MR. MARTIN: I want to be sure my objection and whatnot is still timely. I objected to the improper question from the prosecutor. You sustained the objection. I'm asking for a curative instruction.

Counsel then approached the bench and the trial court and the parties discussed and decided upon an appropriate curative instruction. The court then denied the motion.

MR. MARTIN: Okay. And for the record purposes, I also respectfully request a mistrial.

THE COURT: And that will be denied, sir.

---

THE COURT: Before we start, I want to read something to y'all. You're instructed that certain testimony or statements made relating to the defendant making or not making a statement are inadmissible and cannot be considered in your deliberations. You must wholly disregard such testimony or statements and not consider it as evidence whatsoever.

A similar instruction was later included in the jury charge.

Appellant argues that the "state's theory was that Appellant shot and killed the decedent from the alley: making him one of the only two people who could "describe the conditions in that alley."[1] Though the record reveals that multiple witnesses at trial were at the apartment complex and may have seen the alleyway before or after the shooting who could describe its conditions, because the Rule was invoked, we presume the jury was left to deduce the prosecutor was referring

---

[1] In response, the State notes the lack of punctuation in the transcript of the question asked by the prosecutor and supplies various interpretations of the question to conclude that her question was neither manifestly intended nor of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify.

to the witness on the stand (Demetre) and appellant as they remained the only individuals in the courtroom fitting the description. We also presume some impropriety in the question implicating appellant's right so that we evaluate whether the court's curative efforts were sufficient to remedy any harm.

In applying the *Mosely/Archie* factors to this case, we first consider the severity of the misconduct or the magnitude of the prejudicial effect of the prosecutor's remarks. The prosecutor's question presents a perplexing analysis: The question was arguably improper in two respects, first for the reason that it assumes as true the fact that appellant was in the vicinity of the shooter, and thus the question suggested that appellant was the shooter; and second (for the challenged reason), because it draws attention to the appellant as a potential source of information on the subject of the alleyway conditions and in turn provokes the curiosity of the jury as to whether appellant would testify and illuminate the court with his own personal knowledge on this matter later at trial. Appellant indeed made his silence-election and did not testify at trial. But here, though appellant did not testify, he presented another witness, Watson, that provided testimony that would undermine the assumption that appellant was in the vicinity, and if Watson's version was accepted as true, then appellant would have been unable to illuminate the jury as to those conditions, at least at the time of the shooting. Importantly, the question was not repeated or answered. *See, e.g.*, *Rodriguez v. State*, No. 01-19-00177-CR, 2021 WL 864897, at *7 (Tex. App.—Houston [1st Dist.] Mar. 9, 2021, pet. ref'd) (not designated for publication) (when improper question was not answered or repeated, first *Mosely* factor weighed against mistrial). Also, the State did not attempt to revive its improper comment in closing argument after appellant had made his silence-election. In sum, we cannot conclude that the question was significantly prejudicial.

7

The second factor also favors the trial court's denial, as the trial court promptly instructed the jury to disregard the comment and the jury charge included a similar instruction. The law generally presumes that instructions to disregard and other cautionary instructions will be duly obeyed by the jury. *Archie*, 340 S.W.3d at 741. Here appellant has not shown in the record a basis for rebutting this presumption that the jury honored the court's instruction and disregarded the statement.

Finally, under the third factor, we note that the evidence at trial was significantly favorable for the State and that appellant's defensive theory lacked cohesion. The only element the offense appellant's theory challenged was his identity as Ladisha's shooter. But the State offered an abundance of evidence identifying appellant as the shooter. The testimony and evidence of Tatyana's report of appellant's aggravated assault on the stairwell, of appellant's threatening phone calls to the family, the family's concerted action to protect their children in leaving the property, all provided a convincing basis for the jury to conclude that appellant was a threat to Ladisha's family. Tatyana and Demetre both testified as eye-witnesses to the shooting and identified appellant as the shooter. Additionally, Marvin Bennett told the police that the appellant initiated the shooting. Appellant's witness, Watson, may have contradicted their account but also contradicted appellant's statement. The jury could fairly question Watson's reliability with concerns of his bias, as he admitted to speaking with the appellant the week of trial. At minimum, the jury easily may have found Watson less credible than the neutral account Detective Lewis's reported that Bennett provided which supported Tatyana and Demetre's testimony.

We conclude the *Mosely/Archie* factors weigh in favor of concluding that the trial court did not abuse its discretion in denying appellant's motion for mistrial

8

during the examination of Demetre Robinson.

**B. Did the trial court abuse its discretion in denying appellant's motion for mistrial during the examination of Detective Lewis?**

During the appellant's opening statement, appellant's trial counsel previewed his theory of the case, first explaining what he expected to hear from the State's witnesses then explaining the anticipated testimony of his own witness:

> Then you're going to hear later on in the trial -- the State gets to go first. Then we get to go and present our case. We expect you're going to hear from a witness who was with Mr. Johnson on that day. And he's going to talk about the area being known for weed and what goes on and all of that. And he's also going to be talking about that he was with Mr. Johnson when the shots rang out. And this witness is going to be able -- we believe is going to be able to say, I saw two shooters. One by the car, and one not by the car.

> . . . The dispute that you all are going to resolve is the identity of that other shooter. The State believes it's Mr. Johnson. We don't. We do not concede that.

> Our witness is going to say that they were with Mr. Johnson when the shots rang out. They know Mr. Johnson by sight. They've known him for years. They saw him do what he did that day when the shots rang out. And we believe that witness is going to testify that Mr. Johnson took flight. He ran. Not after he shot at Demetre Robinson. Not after he dropped the gun. Not after he did any of that. But when he heard the shots ring out, we believe this witness will testify that he ran. He was scared.  There's gunfire.

The State while discussing with Detective Lewis his recorded interview, also asked about appellant's knowledge of other witnesses.  Detective Lewis described appellant as providing an open-ended answer, as follows:

> MS. THOMAS: Did the defendant say that anybody saw the shooting, anyone else saw the shooting?

> LEWIS: He stated there was other people out there. I asked who, and he didn't go into detail.

Subsequently,  during  Detective  Lewis's  testimony,  the  following  exchanged

occurred:

> MS. THOMAS: And at any point from the three or so years that you've had this case, have you received any sort of information from Mr. Johnson about a witness to corroborate his story?

> MR. MARTIN: Objection. That is an improper comment again on my client's right to remain silent.

> THE COURT: That will be sustained.

> MR. MARTIN: We request as curative instruction.

> THE COURT: You are instructed that certain testimony or statements made relating to the defendant making or not making a statement are inadmissible and cannot be considered in your deliberations. You must wholly disregard such testimony or statements and not consider it as any evidence whatsoever.

> MS. THOMAS: And, Judge –

> MR. MARTIN: Respectfully we request a mistrial.

> THE COURT: That will be denied.

> MS. THOMAS: And, Judge, just for the record, the question was regarding a witness, not Mr. Johnson.

> THE COURT: You said Mr. Johnson.

> MS. THOMAS: Okay.

Appellant contends the objected-to question suggested to the jury that it could possibly expect appellant to take the stand and answer the questions posed by the prosecutor about information corroborating appellant's "story." We hold no violation occurred, nor that the prosecutor's question was intended or was of such a character that the jury would necessarily and naturally take it as a comment on appellant's failure to testify. In the context of the appellant's opening statement– when his counsel previewed that a witness would testify to support appellant's version of the facts, taken in conjunction with appellant's open-ended statement to Lewis that other individuals would support his account, it was fair for the State to ask if appellant ever identified to Lewis the anticipated witness for the defense.

10

The question does not implicate appellant's right to not to testify.

Even presuming the question violated appellant's right to remain silent, applying the *Mosely/Archie* factors, the prejudicial impact was limited, as the prosecutor suggested the reference to appellant was not intended, an answer to the question was not provided and the question was not repeated. *Rodriguez v. State*, 2021 WL 864897, at *7. The second and third factors favor the trial court's ruling for the same reasons discussed in relation to the previously discussed motion for mistrial. Therefore, we conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial during the examination of Detective Lewis.

We overrule appellant's first issue.

### III. COST ASSESSMENT

The judgment assessed $290 in court costs against the appellant. In his second point appellant claims this amount is incorrect and the State agrees. Here, in calculating costs, the trial court incorrectly applied a new rule when, by virtue of the date of the offense, the old version of the statute applied. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, §§ 5.01, 5.04, 2019 Tex. Gen. Laws 3981, 4035 ("An offense committed before the effective date of this Act [January 1, 2020] is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose.") We sustain appellant's second issue.

### IV. CONCLUSION

We overrule Appellant's first issue challenging his conviction; therefore, we affirm the judgment of conviction. We however sustain appellant's second issue challenging the trial court's assessment of court costs. We reverse the portion of the judgment that assessed $105 in Local Consolidated Court Costs and remand to

11

the trial court for further proceedings limited to recalculation of court costs. *See Authorlee v. State*, No. 14-20-00821-CR, 2022 WL 220267, at \*4 (Tex. App.—Houston [14th Dist.] Jan. 25, 2022, pet. ref'd) (mem. op., not designated for publication).


/s/      Randy Wilson
                Justice

Panel consists of Justice Spain, Justice Poissant, and Justice Wilson.

Do not publish — TEX. R. APP. P. 47.2(b).